[No. B059277. Second Dist., Div. Five. Dec. 22, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
TORAINO LEON YOUNG, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

1300

## COUNSEL

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Mark S. Howell and Matthew P. Boyle, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

JACKSON, J.*—By jury trial appellant Toraino Leon Young was convicted of (1) first degree murder, with the special circumstance that the murder was in the commission of robbery or in the immediate flight after having committed robbery (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17)); (2) robbery (Pen. Code, § 211); and (3) evading an officer, causing death (Veh. Code, § 2800.3). Appellant was sentenced to prison for life without possibility of parole for murder with special circumstances, plus three consecutive years for robbery, plus one consecutive year on revocation of probation for appellant's prior conviction of sale of cocaine (Health & Saf. Code, § 11352); sentence for evading an officer was stayed pursuant to Penal Code section 654.

After robbing a victim of his wallet and his new car, appellant drove the stolen car at high speeds in flight from a pursuing police vehicle. Appellant ran four red lights, then collided with two other vehicles, killing one of the other motorists. We affirm appellant's conviction of first degree felony murder with special circumstances and appellant's sentence of life imprisonment without possibility of parole.

---

*Judge of the Municipal Court for the Antelope Judicial District sitting under assignment by the Chairperson of the Judicial Council.

## FACTS

On the night of July 18, 1989, the robbery victim, Steven Soyars, drove his friend Estella Cabrera to her home on Pico Boulevard in Los Angeles. About 10:10 p.m. they pulled into her driveway, which entered from Dewey Street between Pico and 15th. Soyars was driving his new red Geo Prizm; the car did not yet have its license plates, nor did it have a temporary registration taped to the windshield, because the windshield had been replaced by the dealer.

Cabrera left her purse in the car and walked upstairs to her second-floor apartment to tell her mother she was going out with Soyars. Soyars waited in the car for her. A brown car pulled into the driveway behind Soyars. Two men wearing masks and carrying long guns approached Soyars. The man wearing a white tank top (subsequently identified as appellant) pointed his gun at Soyars and instructed Soyars to move into the back seat; Soyars did as instructed and lay down on the fold-down back seat.

Appellant entered Soyars's car; appellant's companion backed the brown car out of the driveway. Cabrera, who had witnessed these events from her balcony porch, yelled out, loud enough that Soyars heard, "We are calling the police, Steve." Cabrera ran back inside and telephoned 911. Police communications records showed the call came in at 10:23 p.m.

Meanwhile, with Soyars still in the back, appellant drove the Geo south on Dewey, which deadends at 15th Street. Appellant told Soyars to get out. Appellant demanded "where is the money at?" and Soyars handed appellant his wallet.[1] Appellant turned left on 15th Street and drove away.

Soyars went quickly back to Cabrera's apartment, where he found her on the phone with the 911 operator. Cabrera handed the phone to him, and he also spoke to the operator.

Los Angeles Police Officer Isaias Ornelas was on patrol in a black and white police car traveling northbound on Vermont approaching Venice Boulevard. That intersection is only four blocks from Dewey and 15th. Officer Ornelas saw the Geo make a right turn from Venice and come toward him southbound on Vermont. The officer observed there was no front license plate nor was there a registration sticker on the windshield. Appellant was driving the Geo.

---

[1]The distance was 500 feet from the driveway to the deadend where Soyars was let out. The jury failed to reach a verdict on an additional count charging appellant with kidnapping for the purpose of robbery. (Pen. Code, § 209.)

As the vehicles approached each other, the officer observed a surprised, frightened expression on appellant's face. As they passed each other, appellant gave the officer a long look. After passing, Officer Ornelas observed that the Geo had no rear license plate. The officer made a U-turn and followed appellant.

After the officer began following, appellant quickly accelerated to about 50 miles per hour. At the intersection of Vermont and Washington the light was red. Appellant made a right turn without stopping, forcing several westbound cars on Washington to brake in order to avoid colliding with appellant. On Washington appellant accelerated to 70 miles per hour. Officer Ornelas activated his lights and siren and pursued. The officer's partner broadcast on police radio that they were in pursuit. Police records showed this broadcast was made at 10:25 p.m., two minutes after the 911 report of the robbery.

At Washington and Normandie, appellant ran a red light. Appellant turned left on Hobart, right on 21st and right on Oxford. These were residential streets. Appellant was traveling 50 miles per hour except when slowing to negotiate these turns. Appellant again turned westbound on Washington and proceeded at 50 to 60 miles per hour. He ran a red light at Western. Appellant briefly crossed into the eastbound lane, causing several cars to veer to avoid striking him. Appellant ran a red light at Gramercy.

Traveling about 50 miles per hour, appellant ran a red light at Washington and Arlington. At that intersection he collided with a northbound minivan and a southbound Volvo. The Volvo catapulted into the air and landed on its roof. The driver of the Volvo, Martin Brumer, age 28, died at the scene, of multiple trauma to head and chest.

Appellant got out of the Geo and ran. Officers pursued appellant and caught him.

Inside the Geo at the accident scene officers found Cabrera's purse, Soyars's wallet, and a cloth mask subsequently identified by Soyars and Cabrera as similar to what the robber wore.[2]

Appellant testified in his own defense, telling an incredible story which admitted having the collision but denied the prior robbery: Appellant claimed he had been drinking with people for several hours at a park at Venice and Normandie. When appellant asked for a ride from a man he did

[2]No gun was found in the car. The jury failed to reach a verdict whether appellant personally used a firearm in commission of the robbery. (Pen. Code, § 12022.5.)

not know, the man told appellant that appellant could take the red car with the keys in the ignition. Appellant did not see the purse, the wallet or the mask in the car. Appellant drove the car for five or ten minutes. When appellant saw a police car he "panicked and accelerated" because he was on probation for sale of narcotics and he had no driver's license.

CONTENTIONS

Appellant contends (1) his conviction of felony murder with special circumstances should be reversed on the ground the evidence is insufficient to show that the fatal traffic collision occurred in the perpetration of robbery, (2) the trial court applied an improper standard to appellant's motion for new trial for insufficiency of evidence, (3) the sentence prescribed by law, life imprisonment without possibility of parole, is cruel or unusual punishment in the circumstances of this crime and this defendant and (4) execution of the consecutive three-year sentence for robbery must be stayed pursuant to Penal Code section 654.

Finding no merit to these contentions we affirm.

I

FELONY MURDER

Appellant was convicted of first degree murder under the felony-murder rule, which specifies that murder "committed in the perpetration of . . . robbery . . ." is murder in the first degree. (Pen. Code, § 189.) The jury also found as a special circumstance that the murder "was committed while the defendant was engaged in . . . the commission of, . . . or the immediate flight after committing or attempting to commit . . . [¶] [r]obbery . . . ." (Pen. Code, 190.2, subd. (a)(17)(i).) ■ Appellant contends his conviction of first degree murder, and the attendant special-circumstance finding, should be reversed on the ground the evidence is insufficient to show that the homicide resulting from the automobile collision occurred in the perpetration of robbery. There is no merit to this contention.

■ When homicide occurs during a robber's immediate flight from the robbery, the killing is in perpetration of robbery because the robbery is not legally complete until the robber has won the way to a place of temporary safety. (*People* v. *Johnson* (1992) 5 Cal.App.4th 552, 559 [7 Cal.Rptr.2d 23]; see *People* v. *Salas* (1972) 7 Cal.3d 812, 821-824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 101 [270 Cal.Rptr. 817, 793 P.2d 23].) ■ Even if the killing was accidental

or unintentional it constitutes first degree murder under the felony-murder rule. (*People* v. *Salas, supra,* 7 Cal.3d at pp. 823-824.)

In similar circumstances, where the defendant killed another motorist as a result of a collision while the defendant was fleeing from police following a robbery, the court in *People* v. *Johnson, supra,* 5 Cal.App.4th at pages 555-561, found the evidence sufficient to support the jury's verdict of first degree murder and special circumstances. (See also *People* v. *Weddle* (1991) 1 Cal.App.4th 1190, 1193 [2 Cal.Rptr.2d 714] [homicide in vehicle collision during flight from burglary, felony-murder conviction affirmed].) Homicides also occurred in this manner in *People* v. *Fuller* (1978) 86 Cal.App.3d 618, 621-622 [150 Cal.Rptr. 515] and *People* v. *Ulsh* (1962) 211 Cal.App.2d 258, 261-262 [27 Cal.Rptr. 408]. In both cases (appeals from orders dismissing the information) the appellate court held the evidence was sufficient to prosecute the defendant for first degree felony murder. (*People* v. *Fuller, supra,* 86 Cal.App.3d at pp. 622-628; *People* v. *Ulsh, supra,* 211 Cal.App.2d at pp. 264-273.)

■ Whether the robber reached a place of temporary safety is ordinarily a question of fact. (*People* v. *Johnson, supra,* 5 Cal.App.4th at p. 559; *People* v. *Fuller, supra,* 86 Cal.App.3d at p. 623.) ■ On appeal we must view the evidence in the light most favorable to the judgment and presume in support of the judgment every fact the trier of fact could reasonably deduce from the evidence. (*People* v. *Johnson, supra,* 5 Cal.App.4th at pp. 558, 561.)

■ Substantial evidence in this case supports the jury's implied finding that appellant had not reached a place of temporary safety. Through a 911 telephone call, the robbery was reported to the police immediately after it occurred. Appellant was spotted within four blocks, driving the vehicle which he stole in the robbery. Upon sight of a police vehicle following him, appellant fled in the stolen vehicle at high speeds on city streets. Police records showed that the high-speed pursuit began only two minutes after the 911 call.

Even aside from the close proximity in time and distance between the robbery and the police pursuit, it is significant that appellant was driving the vehicle which he stole in the robbery. The jury could conclude appellant was not safe while driving the stolen vehicle on public streets. In *People* v. *Fields* (1983) 35 Cal.3d 329, 367-368 [197 Cal.Rptr. 803, 673 P.2d 680], the court held the evidence was sufficient to conclude the defendant had not reached a place of temporary safety even in defendant's own home, where the robbery victim was held prisoner: "In an unguarded moment, [the victim] might

escape, notify the police, and render the Fields residence quite unsafe for defendant." Similarly here, appellant was not safe while on the street in the stolen vehicle, because to appellant's knowledge the theft would likely be (and in fact it was) immediately reported to the police by the victim and a witness. As trier of the credibility of appellant's testimony, the jury could reasonably infer appellant fled because he knew he was driving a vehicle he had just stolen, rather than because he was on parole and driving without a license. (*People* v. *Johnson, supra,* 5 Cal.App.4th at pp. 560-561 [defendant's subjective belief whether he has reached a place of temporary safety, although not determinative, is a factor jury may consider]; *People* v. *Kendrick* (1961) 56 Cal.2d 71, 89-90 [14 Cal.Rptr. 13, 363 P.2d 13].)

Appellant contends it is crucial here that the officer who began the pursuit was apparently unaware of the robbery. Appellant cites *People* v. *Ford* (1966) 65 Cal.2d 41, 56-57 [52 Cal.Rptr. 228, 416 P.2d 132], where one factor in reversal of the felony murder judgment was that when a policeman approached the defendant the police were apparently unaware of the robbery. (The defendant still had the robbery victim with him in the victim's car.) Appellant's argument is not persuasive. Officer Ornelas testified that he made a U-turn and followed appellant because appellant was driving a vehicle with no license plates or windshield sticker and appellant appeared frightened and nervous when he passed the officer. It is reasonably inferable Officer Ornelas suspected appellant of driving a stolen vehicle, which in fact appellant was. Unlike *Ford,* "the police" knew about the robbery from the 911 call even if Officer Ornelas did not. *Ford* is also distinguishable based on its other facts. There, the defendant had driven about aimlessly for several hours and over great distances; he had reached several places of temporary safety and spent part of the robbery loot before he shot and killed the police officer who approached him. (*People* v. *Ford, supra,* 65 Cal.2d at p. 57; *People* v. *Ford* (1964) 60 Cal.2d 772, 777-784 [36 Cal.Rptr. 620, 388 P.2d 892] [prior appeal in *Ford,* describing facts in greater detail]; see *People* v. *Fields, supra,* 35 Cal.3d at p. 367 [distinguishing *Ford*].)

On the record in this case, substantial evidence supports finding that the killing was in the perpetration of robbery.

## II

### MOTION FOR NEW TRIAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 1299.

## III

### CRUEL OR UNUSUAL PUNISHMENT (*PEOPLE* V. *DILLON*)

The penalty provided by law for first degree murder with special circumstances is death or confinement in state prison for a term of life without the possibility of parole. (Pen. Code, § 190.2, subd. (a).) Apparently the prosecution did not seek the death penalty in appellant's case, therefore the punishment provided by law for appellant is life imprisonment without possibility of parole.

■ Citing *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-489 [194 Cal.Rptr. 390, 668 P.2d 697], appellant contends imposition of the penalty provided by law would constitute cruel or unusual punishment in violation of article I, section 17 of the California Constitution.

The power to define crimes and prescribe punishments is a legislative function. ■ The court may not subvert the legislative process unless the statute prescribes a penalty which is so severe in relation to the crime as to violate the constitutional prohibition against cruel or unusual punishment. The basic test is whether the punishment is so disproportionate to the crime that it shocks the conscience and offends fundamental notions of human dignity. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 478.)

The main technique of analysis under *Dillon* is to examine the nature of the offense and the nature of the offender. (34 Cal.3d at p. 479.) With respect to the nature of the offense, the court considers the offense not only in the abstract but also the facts of the crime in the particular case, "including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Ibid.*) With respect to the nature of the particular person before the court, the question is whether the punishment is "grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

As discussed, *ante,* page 1305, two recent cases involved convictions of first degree felony murder under similar circumstances of a vehicle collision during flight from a robbery or burglary. Neither of those cases, however, determined whether a sentence of life imprisonment without possibility of parole would constitute cruel or unusual punishment for such crime. In *People* v. *Weddle, supra,* 1 Cal.App.4th 1190, the defendant was sentenced to a term of 25 years to life; apparently the prosecution there did not charge, or the jury did not find, special circumstances. (*Id.* at pp. 1192-1193.)

Conducting a *Dillon* analysis, the appellate court held the sentence of 25 years to life was not cruel or unusual punishment. (*Id.* at pp. 1197-1200.) In *People* v. *Johnson, supra,* 5 Cal.App.4th 552, the defendant was found guilty of first degree murder with special circumstances and was sentenced to life without possibility of parole. The appellate court affirmed the verdicts of first degree felony murder and special circumstances. (*Id.* at pp. 557-562.) The portion of the appellate court opinion dealing with the sentence, however, was not certified for publication; the cause was remanded for a new sentencing hearing for reasons not disclosed in the published opinion. (*Id.* at pp. 555, 562.) We proceed with our own *Dillon* analysis of appellant's sentence of life without possibility of parole.

■ Turning to the circumstances of the crime in the instant case, the underlying robbery was a serious aggravated felony. It was obviously premeditated, as indicated by the parking of the brown car behind the robbery victim's car in the driveway. Both robbers approached the victim with guns and masks. Appellant took the victim's wallet from his person and stole the victim's car after driving the victim a short distance. *Dillon* itself recognizes that, in the abstract, robbery-murder represents "a very high level" of danger to society, "second only to deliberate and premeditated murder with malice aforethought." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.)

Although here the robbery victim was not killed, the subsequent death of a bystander during appellant's reckless high-speed flight in the stolen vehicle involves an application of the felony-murder rule which is by no means bizarre or unforeseeable. As to the homicide itself, appellant was the actual killer and sole perpetrator, not a mere aider and abettor. ■ Although appellant attempts to characterize the death as resulting from "accident," the pattern of appellant's driving supports the conclusion that appellant harbored a conscious disregard for human life which constituted implied malice, sufficient to render the homicide a murder even without its connection to the prior robbery. (*People* v. *Olivas* (1985) 172 Cal.App.3d 984, 986-987 [218 Cal.Rptr. 567]; see *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) ■ As aptly characterized in the similar circumstances of *People* v. *Ulsh, supra,* 211 Cal.App.2d 258, 273 "[appellant was] of the mind that human life was not to be permitted to stand in the way of [his] escape." Such demonstrated wanton disregard for human life weighs heavily under *Dillon* in favor of the severe penalty mandated by statute. (*People* v. *Weddle, supra,* 1 Cal.App.4th at p. 1199 ["defendant's driving, which included a gross disregard for traffic laws and the well-being of others, culminated in the death of one individual and injury to two others. Any one of defendant's violations could have caused death or serious injury, and under the circumstances, the fact only one person was killed was fortuitous"].)

In order to analyze the nature of the particular offender, we review the probation officer's report. At the time of this murder appellant was 19 years old. Appellant was on probation for his prior adult conviction at age 18 of selling rock cocaine to an undercover officer and had served time in county jail as a condition of that probation. As an adult, appellant also had a prior arrest, not leading to conviction, for burglary, robbery, and assault with a deadly weapon. As a juvenile, appellant had two police contacts not resulting in sustained juvenile petitions, for robbery and for possession of less than an ounce of marijuana.

Investigating police officers told the probation officer appellant was a known gang member. Appellant admitted to the probation officer that he "hangs around" with the "Inglewood Family Bloods" but denied being an active member.

The probation officer concluded that in light of appellant's total disregard for the safety of others, the statutory punishment, "defendant's permanent removal from society," was warranted.

In summary, this case involves an adult with a prior criminal record, who committed a premeditated armed robbery, who in attempting to escape from that robbery drove 60 to 70 miles per hour on city streets at night through four red lights, with wanton disregard for the high risk to human life and, who, as a result of his own conduct, killed an innocent bystander. Neither the circumstances of the crime nor those of the offender in this particular case compel the conclusion that the punishment provided by law would be so disproportionate as to shock the conscience of the court or offend fundamental notions of human dignity.

Appellant's case contrasts sharply with *Dillon*. At the time of the murder in *Dillon* the defendant was 17, legally a minor, although prosecuted as an adult. The uncontradicted evidence, which was *accepted* by a sympathetic jury and trial judge, showed the defendant was unusually immature and childlike, even for a person of 17. (*People* v. *Dillon*, *supra*, 34 Cal.3d at pp. 482, 483, 486, 488.) The defendant had no prior criminal record at all. (*Id.* at p. 486.) In *Dillon* the defendant testified frankly, admitting the shooting and attempting to explain the panic which led him to shoot. (*Id.* at pp. 482-483.) The jury sympathized but had no alternative under the law than finding the defendant guilty of first degree felony murder. (*Id.* at p. 485.) The jury, the probation officer and the trial judge all concluded the statutory penalty was extraordinarily harsh as applied to the defendant.

Here appellant was legally an adult. There was no evidence he was unusually immature. Appellant had a prior felony conviction, sale of cocaine, and had served time in county jail. Appellant had other arrests and

was believed involved in a gang. Appellant told an incredible story denying his involvement in the robbery, and maintained the same story to the probation officer. The probation officer recommended the statutory penalty was justified. The trial judge, while agreeing that appellant's record was "not in the grand scope of things that we see downtown, a horrendous record[,]" concluded "I do not believe that the *Dillon* analogy holds. I think there is just a little too much here in the way of his record for the court to make—to take the *Dillon* analogy and find that the sentence prescribed by law would be cruel and unusual in these circumstances, and the court declines to make that finding."

Citing *People* v. *Dillon, supra,* 34 Cal.3d at page 487 and footnote 38, appellant suggests that his crime be compared to other assertedly more heinous forms of murder. This argument is not persuasive. In *Dillon* the defendant was a minor; the *Dillon* court used the comparison with other crimes in order to point out that "[b]ecause of his minority *no greater* punishment could have been inflicted on the defendant if he had committed the most aggravated form of homicide known to law." (*Id.* at p. 487, italics added.) That is not the situation here. Both for appellant's crime, homicide caused unintentionally by the actual killer in the commission of a designated felony (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1147) [240 Cal.Rptr. 585, 742 P.2d 1306], and for the other assertedly more aggravated forms of special circumstances murder (Pen. Code, § 190.2, subd. (a)), the law authorizes a greater penalty, death. Since appellant did not receive the death penalty, his further *Dillon* argument is unpersuasive. (See *People* v. *Loustaunau* (1986) 181 Cal.App.3d 163, 177 [226 Cal.Rptr. 216]; *People* v. *Harpool* (1984) 155 Cal.App.3d 877, 889-890 [202 Cal.Rptr. 467].)

IV

MULTIPLE PUNISHMENT

The trial court sentenced appellant to a three-year term for robbery, to run consecutively with appellant's life term for murder.  ▮  Appellant contends the consecutive sentence for robbery is barred by Penal Code section 654 because the robbery was the act which rendered the homicide first degree murder. (*People* v. *Mulqueen* (1970) 9 Cal.App.3d 532, 547 [88 Cal.Rptr. 235]; *People* v. *Boyd* (1990) 222 Cal.App.3d 541, 575-576 [271 Cal.Rptr. 738]; *People* v. *Magee* (1963) 217 Cal.App.2d 443, 471 [31 Cal.Rptr. 658].)

The cases cited by appellant are distinguishable because in those the robbery victim was the person killed. Under Penal Code section 654 as

construed by the California Supreme Court, even if a defendant entertained a single principal objective during an indivisible course of conduct, he may be punished separately if during the course of that conduct he committed crimes of violence against different victims. (*People* v. *Miller* (1977) 18 Cal.3d 873, 885-886 [135 Cal.Rptr. 654, 558 P.2d 552].)

Since appellant robbed one person, and in the commission of that robbery killed a different person, appellant may be punished for both robbery and murder. (*People* v. *Johnson* (1974) 38 Cal.App.3d 1, 9 [112 Cal.Rptr. 834]; *People* v. *Lowe* (1975) 45 Cal.App.3d 792, 795, fn. 1 [119 Cal.Rptr. 699]; see *People* v. *Andrews* (1989) 49 Cal.3d 200, 225 [260 Cal.Rptr. 583, 776 P.2d 285].)

The judgment is affirmed.

Boren, Acting P. J., and Grignon, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 18, 1993. Mosk, J., was of the opinion that the petition should be granted.