Filed 1/3/14 (unmodified version attached)

<u>CERTIFIED FOR PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B245774 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA047792) |
| v. | |
| JOSE ABUNDIO, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the petition for rehearing, filed by appellants on January 2, 2014, is denied; and that the opinion filed herein on December 4, 2013, be modified in the following particulars:

At page 2, line 6, of the slip opinion, the sentence, "The jury also found true the special circumstance allegation that he committed the murder in the commission of a

robbery, and the allegation that he used a knife" is deleted and replaced with the following:

> "The jury also found true the special circumstance allegation that he committed the murder in the commission or attempted commission of a robbery, and the allegation that he used a knife."
> There is no change in the judgment.

_____

*EPSTEIN, P. J.                    WILLHITE, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B245774 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. MA047792) |
| JOSE ABUNDIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed.

Barbara S. Perry, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

In an unprovoked, premeditated attack, appellant Jose Abundio stabbed marijuana dealer Timothy Wong to death in order to rob him of marijuana appellant could not afford to buy. After appellant's first jury deadlocked and a mistrial was declared, a second jury convicted him of first degree murder. The jury also found true the special circumstance allegation that he committed the murder in the commission of a robbery, and the allegation that he used a knife. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17), & 12022, subd. (b)(1).)[1] The trial court sentenced him to life in prison without the possibility of parole, plus one year. On appeal, he contends that his sentence constitutes cruel or unusual punishment under California Constitution, article I, section 17, and *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), abrogated on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172, 1186. We disagree and affirm the judgment.

## BACKGROUND

According to Kourtney Garcia, Timothy Wong's girlfriend, Wong had been selling marijuana for about a year before he died. Before the killing, he had sold marijuana to appellant six or seven times, and there had never been any problem between them. They called each other by familiar names: appellant was "Joe," and Wong was "Timmy."

On the night of the killing, December 19, 2009, around 9:00 p.m., appellant was with three friends, Josue Hernandez, Felix Martinez, and John Bowen, watching television at Bowen's house on 171st Street in Lake Los Angeles. Appellant borrowed Hernandez's cell phone, walked around the corner of the house, and made three to five phone calls. He then erased the numbers he had dialed.

---

[1] All further statutory references are to the Penal Code.

Hernandez saw a white sedan pull up and stop in front of Bowen's house. Appellant walked out to the car and returned to the house about ten minutes later. The car drove away.

The white car observed by Hernandez was Wong's. According to Garcia, Wong received a phone call from appellant asking to buy marijuana. After Wong and Garcia obtained the marijuana, Wong received another phone call from appellant, and placed it on speaker phone. Wong said, "I got it," named a price, and said he would be there soon. Appellant said, "Don't trip about the price. Just come over."

Wong and Garcia drove to Bowen's house on 171st Street. Appellant came out to the car and stood by the passenger side where Garcia was seated. After appellant and Wong discussed the price, appellant said he needed to get change. Although Wong told appellant that he had change, appellant insisted that he needed to go down the street to get change and would arrange to meet Wong later. Appellant also repeatedly asked Wong if Garcia would be present at a later meeting. Further, although Wong and appellant had never hung out socially before, appellant asked Wong if he wanted "to hang out and kick it and drink and smoke." Wong declined because his family was visiting.

According to Hernandez, when appellant returned to Bowen's house, he said, "I'm going to kill them." He added that he wanted to get marijuana and was going to get more than he could afford. Hernandez thought that appellant was joking. Bowen overheard appellant tell Martinez that he was going to jump "Timmy" for marijuana. Bowen did not take appellant seriously and told appellant it was stupid.

Appellant asked Bowen if he could borrow some gloves. Bowen gave him a pair of black wool gloves. Bowen did not consider the request unusual, because

3

appellant had borrowed his clothing before. Appellant then asked Bowen to drive him someplace using Bowen's girlfriend's car. Hernandez, Martinez, Bowen, and appellant got in the car, and appellant gave Bowen directions. At first appellant said he wanted to go to the store to get snack food, but while they were driving, appellant said he wanted to go to Wong's to buy marijuana. Bowen asked, "You are not going to do anything, right?" Appellant said he was not and that he was going to "buy a 40," which Bowen assumed meant $40 worth of marijuana. Hernandez and Bowen did not see appellant with a knife.

After driving for about 15 minutes, they arrived at a house. Appellant asked Hernandez to get out of the car with him and told Bowen to park the car down the street. Hernandez and appellant got out of the car, and Bowen drove down the street with Martinez and parked.

Appellant borrowed Hernandez's phone and made a call. Wong came out of the house, and appellant introduced him to Hernandez as "Timmy." Wong told appellant that he had "the stuff" and directed him to walk over to Wong's car, which was parked in the driveway. Wong walked behind and to the right of Hernandez, and appellant walked to Wong's right. There was no argument, confrontation, or dispute between appellant and Wong.

As they were walking, Hernandez noticed a glint of light, turned, and saw appellant jump on Wong's back. Appellant's arm was wrapped around Wong so that his arm and hand were in front of Wong. Wong started screaming, "Take it. Just take it." They fell to the ground, and Wong screamed, "Call the cops." After they fell on the ground, appellant was on top of Wong and appeared to punch Wong in the back about five times. Hernandez heard a gurgling sound.

Hernandez ran to Bowen's car, got in, and told Bowen that "something bad" had happened. Bowen asked what he meant, and Hernandez said that he thought

4

appellant stabbed Wong. Hernandez told Bowen they should leave. Bowen started to turn the car around to pick up appellant, but they worried that appellant might stab them. They returned to Bowen's house without appellant.

Hernandez and Martinez went to their homes. Bowen went inside his house and told his family and girlfriend what had happened. Before Bowen could call the police, officers arrived at the house. Bowen told them what happened.

According to Garcia, after leaving the house on 171st Street, she and Wong went to Wong's house, where they had dinner with Wong's family. During dinner, Wong received a call on his cell phone and told the caller he would go outside. While still talking on the phone, Wong walked outside with his dog.

After Wong walked outside, Garcia heard Wong screaming, a dog barking, and car tires screeching. Garcia ran outside and saw Wong bleeding from his neck and chest, screaming for help and saying, "That fool stabbed me. I can't believe it." Wong fell to the ground. His brother asked who did it, and Wong said it was "Joe."

Wong died of multiple stab wounds. An autopsy revealed that he suffered three stab wounds to his back, three to the back of his neck, and one to his abdomen. Wong also had defensive wounds on his hand from trying to divert the knife.

Detective Steve Owen and his partner responded to Wong's house and spoke to Garcia, who directed them to Bowen's house on 171st Street. Around 2:00 a.m. that night, Detective Owen was outside his car on 171st Street when he saw appellant walking toward him with his hands raised. Appellant said, "I'm sorry. I did something really bad and wrong. I'm sorry and I'm scared."

Appellant was interviewed at the sheriff's station by Detectives Troy Ewing and J. Leslie. A recording of the interview was played at trial. After waiving his

5

rights under *Miranda v. Arizona* (1966) 384 U.S. 436, appellant stated, "I didn't really mean to do it but when I did it, I – I couldn't believe I did it 'cause I was just – I was shocked, I was scared, I ran." Detective Leslie asked appellant if he went home after it happened, and he replied, "No. I was out and running around 'cause I didn't know what to do. I was – I didn't even believe I did – that I even did it myself. I was just scared. I didn't even – I didn't mean to hurt anybody."

Appellant told the detectives that he had contacted Wong to buy an ounce of marijuana, but he did not have the money to pay for it, so he planned to take it. When Wong came to Bowen's house with the marijuana, appellant was unable to take the marijuana because Garcia was in the car. Therefore, appellant lied and told Wong he needed to get change for a $100 bill. Appellant then decided to go to Wong's house and steal the marijuana from him. He told Hernandez and Martinez his plan, but he did not tell Bowen. He intended to beat Wong up to take the marijuana, so he took a knife from his mother's kitchen, hid it outside his house, and retrieved it when they left for Wong's house. He concealed it in his waistband. Hernandez and Martinez knew he had the knife, but they did not know he was going to kill Wong.

Appellant said that he panicked after stabbing Wong, but he chased Wong and continued to stab him. He did not know how many times he stabbed him. Detective Leslie asked appellant if he wanted to kill Wong, but appellant replied, "No. I didn't – no. I wouldn't do nothing like that. I just wanted to get some bud."

After the stabbing, appellant ran away and took some clothes he found hanging on a fence. He discarded his bloody clothing and the one remaining glove.

6

## DISCUSSION

In *People v. Dillon, supra,* 34 Cal.3d at page 488, relying on the peculiar circumstances of the case, the California Supreme Court held that a life sentence imposed for felony murder on an "unusually immature" 17-year-old high school pupil who killed in the belief that he was acting in self defense constituted cruel and unusual punishment under the state constitution. In the instant case, relying on *Dillon,* appellant filed a motion to strike the special circumstance finding. Reviewing the totality of the circumstances as mandated by *Dillon,* and examining the individual characteristics of appellant and his crime, the court denied the motion, reasoning as follows:

"In making my decision, . . . I recognize factually that there are some factors here that are sympathetic for [appellant]. I don't think . . . he was mentally retarded or had any psychological problems, but he certainly seemed somewhat immature perhaps both intellectually and emotionally [and] [h]e did come forward fairly immediately in terms of admitting his involvement [and] gave a fairly straightforward confession. . . . The *Dillon* case did have some similarities in that it did concern . . . marijuana. It was a raid on the marijuana farm, but there are some differences here that concern me. That particular defendant [in *Dillon*] . . . testif[ied], [and] the heart and issue in that case was a self-defense type situation because he believed that the victim in that case was pointing a gun at him.

"What concerns me here is when I consider the specific facts of this case, one could easily make an argument that, separate from the felony murder theory, which can result in murder even if it is accidental or negligent, we don't have . . . something that was accidental or negligent. . . . [I]t falls higher on the premeditation level in that there was an earlier contact. He had an opportunity in terms of bringing the knife. He sought out the victim at his house, with his family

7

and relatives, and the actual incident occurred involved multiple stabbings. So there was a higher level of premeditation.

"I recognize his youth, that he was 18 years old. But in terms of making – exercising this discretion, the case law is clear. It is not a situation of sympathy or whether we feel it is too harsh. . . . [The issue is] does it rise to the level of being cruel and unusual under state or federal grounds."

The court next considered appellant's prior record, which showed two contacts as a juvenile (one for truancy, the other for being a runaway) and a sustained juvenile petition for assault with a stun gun (§ 244.5, subd. (b)), for which he was placed home on probation. The court characterized appellant's juvenile history as "somewhat minor," but noted that on a prior occasion he had brought a stun gun to school, thus suggesting that the instant case was a "severe escalation of behavior." The court concluded that "under the totality of the circumstances and taking into account the particularized facts of the case and [appellant] as an individual, the court declines to exercise its discretion to strike the special circumstance finding."

Appellant contends that the trial court erred, because his sentence constitutes cruel or unusual punishment under the *Dillon* analysis. We disagree.

"'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]' [Citation.] Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity. [Citation.]" (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted.)

8

"'To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts.  The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities.  [Citation.]  If the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], so that the punishment ""'"shocks the conscience and offends fundamental notions of human dignity"'""' [citation], the court must invalidate the sentence as unconstitutional.'  [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1300.)

*Dillon* was a unique case.  Defendant Dillon was a 17-year-old high school student who attempted to steal marijuana from a nearby farm.  After he was rebuffed several times by the shotgun-wielding owner of the farm, he recruited friends and made plans to steal the marijuana.  They intended to hit the owner or tie him to a tree.  The boys armed themselves with shotguns, a baseball bat, sticks, and a knife, and the defendant carried a semi-automatic rifle.  After one of the eight boys accidentally discharged his shotgun twice, the owner approached carrying a shotgun.  Dillon shot him nine times, killing him.

At trial, Dillon testified that when he heard his friend's shotgun discharge the first time, he became afraid that his friend might have been shot, and he panicked after hearing the second shotgun blast.  He further testified that he shot the victim only because he was afraid the victim was going to shoot him.  He described how he saw the victim swing the gun around toward him.  Further, a clinical psychologist testified that Dillon was immature intellectually, socially, and emotionally.

9

During jury deliberations, the jurors asked why the psychologist's testimony was admitted if Dillon was being tried as an adult and whether, even if the killing occurred during an attempted robbery, they could return a verdict of second degree murder or manslaughter. Ultimately, the jury convicted the defendant of attempted robbery and first degree murder. Before discharging the jurors, the trial judge "expressed sympathy with their evident reluctance to apply the felony-murder rule to these facts." (*Dillon, supra*, 34 Cal.3d at p. 484.) After the prosecutor advised the jury that their observations about the case would be welcomed, the jury foreman wrote a letter, stating that it was difficult for the jury not to allow compassion to influence its verdict because the defendant "'by moral standards is a minor.'" (*Ibid.*) The judge sentenced Dillon to the Youth Authority rather than state prison, reasoning that he was immature in many respects, was not dangerous compared to other people convicted of first degree murder, and had no criminal record. The judge further reasoned that the evidence showed that he did not intend to kill the victim and that it "'was not a planned, deliberate killing.'" (*Id.* at p. 486.) However, at the time of the offense a minor convicted of first degree murder was ineligible for commitment to the Youth Authority, and therefore the court of appeal issued a writ of mandate directing the trial court to set aside the commitment. Thereafter, the trial court sentenced Dillon to life imprisonment.

On appeal, the California Supreme Court concluded that Dillon's life sentence violated the California constitutional prohibition against cruel or unusual punishment. (*Dillon*, *supra*, 34 Cal.3d at p. 489.) Citing the jury's questions, the judge's comments, and the jury foreman's letter (*id.* at pp. 482-484), the court reasoned that the trial judge and jury "gave defendant's testimony large credence and substantial weight." The court further found that the evidence supported the judge and jury's apparent belief "that a sentence of life imprisonment as a first

degree murderer was excessive in relation to defendant's true culpability." (*Id.* at p. 487.)

The court characterized the evidence as follows: "[A]t at the time of the events herein defendant was an unusually immature youth. He had had no prior trouble with the law, and . . . was not the prototype of a hardened criminal who poses a grave threat to society. The shooting in this case was a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger. To be sure, he largely brought the situation on himself, and with hindsight his response might appear unreasonable; but there is ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate. [¶] Finally, the excessiveness of defendant's punishment is underscored by the petty chastisements handed out to the six other youths who participated with him in the same offenses." (*Dillon*, *supra*, 34 Cal.3d at p. 488.)

Appellant's case is markedly distinguishable from *Dillon*. True, at age 18 appellant was only one year older than Dillon. But he had reached the age of adulthood, and, although the trial court observed that appellant "seemed somewhat immature perhaps both intellectually and emotionally," nothing in the record suggests that he manifested the unusual immaturity shown by Dillon. Indeed, whereas a clinical psychologist testified that Dillon was immature intellectually, socially, and emotionally, no such testimony was presented here. Moreover, unlike Dillon, who had no prior record, defendant had a sustained juvenile petition for assault with a stun gun. As the trial court observed, the instant case reflected a significant escalation in violent criminality.

Contrary to appellant's suggestion, appellant's plan demonstrated nothing of the immature, nonlethal grandiosity suggested by Dillon's intended scheme.

11

Appellant's plan was simple and straightforward: he was going to rob Wong of marijuana and (as he told Hernandez) kill him. After Garcia's presence in Wong's car outside Bowen's house foiled appellant's first robbery plan, he settled on another, in which he would lure Wong from his house, rob him at knife point in the street, and kill him. He obtained a knife, hid it in front of his house, later retrieved it, and hid it in his waistband before he had Bowen drive him to Wong's house. In committing the murder, he viciously stabbed Wong without provocation three times in the back, three times in the back of the neck, and once in the abdomen. Wong was unarmed and pleaded for appellant to simply take the marijuana. His only resistance, as shown by defensive wounds on his hand, was an ineffectual attempt to ward off the knife. Obviously, unlike Dillon, appellant did not act rashly in "response to a suddenly developing situation that [he] perceived as putting his life in immediate danger." (*Dillon, supra*, 34 Cal.3d at p. 488.) Rather, he intentionally attacked and killed Wong by planned subterfuge.

Appellant notes that first trial resulted in a hung jury, and argues that this circumstance is analogous to the jury in *Dillon* expressing regret about a first degree murder verdict required by the felony murder rule. However, the record does not suggest that the first jury in appellant's case, like the jury in *Dillon,* was reluctant to convict because it believed that appellant was "'by moral standards . . . a minor.'" (*Dillon*, *supra*, 34 Cal.3d at p. 484.) To the contrary, as we have noted, appellant was an adult and there was no evidence of unusual immaturity.

Although acknowledging that he was 18 years old at the time of the offense and therefore not a juvenile, appellant attempts to rely on the United States Supreme Court's decisions in *Graham v. Florida* (2010) 560 U.S. 48 and *Miller v. Alabama* (2012) 132 S.Ct. 2455, which addressed the constitutionality of sentences of life without the possibility of parole in juvenile cases. On this issue, we find our

12

prior decision in *People v. Argeta* (2012) 210 Cal.App.4th 1478 instructive. There, the defendant similarly tried to rely on *Graham* and *Miller*, arguing that he committed the offense of first degree murder only five months after his 18th birthday. We rejected his argument, explaining that, "while 'drawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules, [that] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude Argeta's sentence is not cruel and/or unusual under *Graham*, *Miller*, or *Caballero*." (*Id.* at p. 1482.) Pursuant to *Argeta*, we conclude that appellant's sentence is not cruel and/or unusual under *Graham* and *Miller*.

"It is a rare case that violates the prohibition against cruel and/or unusual punishment." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1072.) This is not that rare case. The planning in which appellant engaged, as well as the unprovoked and vicious nature of the crime lead us to conclude that appellant's sentence is not grossly disproportionate to the nature of the offense or to appellant's culpability.

13

**DISPOSITION**

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

14