Filed 12/18/20  P. v. Ridge CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES DEMAUNTE RIDGE,<br><br>Defendant and Appellant. | F077952<br><br>(Super. Ct. No. MCR056744C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant James Demaunte Ridge appeals following his conviction of first degree murder (Pen. Code, § 187)[1] with the special-circumstance findings that the murder was

---

[1] Undesignated statutory references are to the Penal Code.

committed during an attempted robbery and committed during an attempted burglary (§ 190.2, subd. (a)(17)), and that he personally used and discharged a firearm causing death (§§ 12022.5, subd. (a), 12022.53, subd. (b)). Appellant contends the trial court prejudicially admitted the full scope of plea agreements underlying the testimony of two coconspirators. He also contends his life sentence without the possibility of parole constitutes a cruel and unusual punishment. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

James Pany and LaTisha Logan were asleep together in Pany's house around 2:00 a.m. on June 26, 2017, when there was a knock on the door. Logan told Pany she would answer the door and proceeded downstairs to do so. A short time later, Pany heard a loud pop. He ran downstairs and found Logan dead on the floor in a pool of blood. Pany ran outside but saw no one.

Police responded to the scene. Their investigation showed Logan had been shot once, with the bullet traveling through her forearm and into her head. A single shell casing and a note that read, "Hide in neighbor's yard," were found at the scene. During the investigation, police spoke with Logan's son, Elisha Jones, and learned Jorge Murillo had left him a message about the shooting. Jones eventually worked with the police to make pretext calls to Murillo.

These pretext calls confirmed that Murillo, Kahlid Ramsey, and appellant were present at the scene and involved in Logan's murder. Ultimately Murillo and Ramsey entered into plea agreements and testified at trial. Based on their testimony and additional police work, a general picture developed of the events that night.

This evidence showed that Murillo, Ramsey, and appellant went to Pany's house to rob him. Murillo testified that he had been upset with Pany because Pany had recently been touching women in inappropriate ways and that he and Jones discussed a plan to beat and rob Pany. That plan involved Murillo getting a couple of people and a weapon

2.

and robbing Pany to teach him a lesson. Murillo eventually called appellant, who agreed to take part in the robbery and who then contacted Ramsey to assist.

A surveillance video showed appellant and Ramsey meeting up around 1:00 a.m. Ramsey hid a gun in the engine compartment of the truck they were using. A later surveillance video showed Murillo, Ramsey, and appellant returning to the same location Ramsey and appellant initially met at around 2:15 a.m., this time driving a Chevy Impala. Ramsey retrieved a gun from where he had hidden it in the engine compartment of the Impala.

Murillo testified that he, Ramsey, appellant, and Jones met up, with appellant and Ramsey arriving in a truck, and discussed the plan one further time. Ramsey transferred the gun from the truck to Murillo's Chevy Impala, and Murillo, Ramsey, and appellant drove to Pany's house. Ramsey retrieved the gun and gave it to appellant. The three walked to Pany's door and Murillo knocked. Appellant moved in front of the door and raised the gun. A short time later, the door opened. Murillo heard Logan yell and appellant immediately shot her. The three then fled. Murillo testified he did not recall telling detectives that appellant claimed to see a gun when the door opened.

Ramsey confirmed that he provided the gun used in the shooting, claiming appellant had contacted him using Facebook and asked him for the weapon. Ramsey corroborated details of the initial meeting between him, Murillo, appellant, and Jones. However, he claimed to have stayed in the car during the robbery, serving as a lookout. Ramsey stated he saw appellant with the gun as he headed away from the car, that he heard screaming and a gunshot before seeing appellant and Murillo run back to the car. At some point, Ramsey heard appellant say he thought Logan had a gun. Ramsey ultimately testified that appellant had shot Logan on accident.

*Evidence Regarding Plea Deals*

Both Murillo and Ramsey testified they had entered into a plea agreement with the People. The People moved their plea agreements into evidence without objection.

Murillo testified he agreed to plead guilty to a charge of first degree murder with a potential sentence of 25 years to life. However, if he testified truthfully at appellant's trial, he would receive a specific sentence of 18 years. In explaining this agreement, the People asked Murillo who would determine if his testimony was truthful. When Murillo indicated he would be the one to decide if he testified truthfully, the People asked, "Is it your understanding that at the conclusion of your testimony, the judge is going to evaluate how you have testified, and, if the judge finds that you testified truthfully, then you get the deal?" Murillo responded, "Yes."

Appellant immediately objected on relevance grounds. The court overruled the objection, but admonished the jury as follows: "And, ladies and gentlemen, I just want to reiterate once again that this agreement and my determination has nothing to do with your determination as to the credibility of this witness. You are going to decide that based upon the testimony and your common sense and the instructions that I give to you on evaluating the credibility of a witness. And don't take anything I say or do as an indication of what I think about that."

After Murillo's testimony, appellant cross-examined Murillo on parts of the agreement, including the fact that Murillo would lose the deal if he testified appellant did not have anything to do with the shooting.

Ramsey also testified about his plea agreement and had no objection when the People moved the agreement into evidence. The People again elicited that Ramsey was facing a 25-year-to-life sentence and that he would receive an 18-year sentence if the judge determined he testified truthfully. The judge also immediately admonished the jury, even though there was no objection, stating, "Ladies and gentlemen, I want to remind you, once again, my determination has nothing to do with your determination as to the credibility of any witness."

*Verdict and Sentencing*

Following the trial, the jury entered deliberations. After two days of deliberating, the jury reached a verdict on the main counts, but could not agree on two of the special circumstance allegations. The jury found appellant guilty of first degree murder and found true the special circumstance allegations that the murder was committed during a burglary, that the murder was committed during a robbery, and that appellant personally used a firearm. The court declared a mistrial on the two remaining special circumstance allegations, specifically that appellant intentionally discharged a firearm and intentionally discharged a firearm causing Logan's death.

At sentencing, the court acknowledged it had the discretion to strike the special circumstance allegations under sections 12022.53 and 12022.5 but determined it would not be proper to do so. The court concluded, based on appellant's jail telephone conversations, that appellant lacked remorse and was, in fact, the shooter. The court ultimately sentenced appellant to life without the possibility of parole and enhanced that sentence with an additional 10-year term under section 12022.53, subdivision (b). A second 10-year term was imposed under section 12022.5, subdivision (a) and stayed.

This appeal timely followed.

## DISCUSSION

Appellant raises two allegations of error. First, appellant claims the trial court invaded the jury's responsibility to independently determine the credibility of all witnesses by permitting them to hear certain details of the plea agreements Murillo and Ramsey received. Appellant contends the trial court's failure to sanitize the testimony was prejudicial error. Second, appellant contends his sentence of life without the possibility of parole constitutes a cruel and unusual punishment. He contends his youth, prior record, and the fact that the shooting was not found intentional by the jury supports his position.

5.

## *Any Error in Detailing the Plea Agreement Was Harmless*

Appellant contends that the trial court wrongly permitted the jury to hear portions of the plea agreement in this case which, in turn, led the jury to potentially conclude the judge had determined Murillo and Ramsey had testified truthfully. Relying on *People v. Fauber* (1992) 2 Cal.4th 792, 823 (*Fauber*), appellant argues that a court is obligated to "exclude the parts of the agreement that are irrelevant to the jury's credibility determination, or are potentially misleading." Appellant contends the error was not harmless because the accomplice testimony offered was the only evidence suggesting appellant was the shooter, noting that the physical evidence pointed to Ramsey as the shooter, and that Murillo was the only person with a known motive. We disagree with appellant. *Fauber* confirms no prejudicial error arose.

Fauber

In *Fauber*, the defendant appealed following his conviction for robbery, burglary, and first degree murder. (*Fauber*, *supra*, 2 Cal.4th at p. 811.) One of the arguments he raised related to the introduction of the plea agreement an accomplice witness named Buckley testified under. (*Id.* at p. 820.) Fauber argued introduction of certain aspects of the agreement violated various constitutional protections. (*Ibid.*) As our Supreme Court explained, "Defendant's objection [was] not to admission of the agreement per se, but to the failure to excise certain portions that he views as 'vouching' for Buckley's credibility and as placing on the trial court rather than the jury the responsibility to determine whether Buckley was telling the truth." (*Id.* at p. 822.)

In *Fauber*, two issues with the plea agreement were discussed. In the first, the defendant complained about a provision of the agreement that referenced the district attorney's preliminary determination of Buckley's credibility as a condition for the plea. (*Fauber*, *supra*, 2 Cal.4th at p. 822.) In the second, the defendant argued "the plea agreement made the trial court a monitor of Buckley's truthfulness, and thereby placed its prestige behind Buckley's testimony, by providing that '[i]n the event of a dispute, the

truthfulness of Mr. Buckley's testimony will be determined by the trial judges who preside over these hearings.' " (*Ibid.*)

Our Supreme Court considered both aspects individually. With respect to the prosecutor's preliminary determination of truthfulness, the court outlined the general rule against such bolstering before explaining the reference "had little or no relevancy to Buckley's veracity at trial, other than to suggest that the prosecutor found him credible. Thus, the reference should have been excised on a timely objection on the ground of irrelevancy." (*Fauber*, *supra*, 2 Cal.4th at p. 822.) Considering the judge's role, the court was less certain of error. After affirming that prior case law required full disclosure of plea agreements, it wrote: "Portions of an agreement irrelevant to the credibility determination or potentially misleading to the jury should, on timely and specific request, be excluded. Here, it was crucial that the jury learn what would happen to … Buckley in the event he failed to testify truthfully in defendant's trial. But the precise mechanism whereby his truthfulness would be determined was not a matter for its concern. The provision detailing the judge's determination of Buckley's credibility in the event of any dispute arguably carried some slight potential for jury confusion, in that it did not *explicitly* state what is implicit within it: that the need for such a determination would arise, if at all, in connection with Buckley's sentencing, not in the process of trying defendant's guilt or innocence. For these reasons, had defendant objected to its admission, the trial court would have acted correctly in excluding it on a relevancy objection." (*Id.* at p. 823.)

Despite noting the potential for error in both scenarios, our Supreme Court found any error was harmless. Looking first at the prosecutor's preliminary determination, the court cited to the *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) standard of review for harmless error. (*Fauber*, *supra*, 2 Cal.4th at p. 822.) This test asks whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) The court found this

standard could not be met for three reasons: first, the prosecutor argued Buckley was credible based on the evidence adduced at trial and not because of the agreement; second, common sense suggested the jury would have expected a prosecutor to conclude their witnesses were credible; and third, the provision cut both ways, suggesting the prosecutor believed Buckley but also that Buckley was seeking to appease the prosecutor. (*Fauber*, at p. 822.)

With respect to the judge's role aspect, the court found "no possibility that defendant was prejudiced by its admission." (*Fauber*, *supra*, 2 Cal.4th at p. 823.) Again, the court identified three reasons. First, akin to its previous commonsense position, the court explained that the "jury could not reasonably have understood Buckley's plea agreement to relieve it of the duty to decide, in the course of reaching its verdict, whether Buckley's testimony was truthful." (*Ibid.*) Second, the court found no evidence the prosecutor's argument could have misled the jury on this point. The court noted, "The prosecutor argued that Buckley had nothing to gain by lying because the trial court would make a determination of his credibility in the event of a dispute. The context of the remarks made it clear that determination would occur if the prosecutor sought to repudiate its agreement with Buckley after trial in defendant's case." (*Ibid.*) Third, our Supreme Court noted that the trial court had specifically instructed the jury that it was the sole judge of witness credibility and highlighted that the jury is presumed to understand and follow the trial court's instructions. (*Ibid.*)

*Any Error is Harmless*

As detailed in *Fauber*, trial courts should consider sanitizing plea agreements that imply or leave open the possibility the trial court will weigh a witnesses testimony for truthfulness during trial as opposed to at the time of the witness's sentencing because such agreements may generate confusion. However, the failure to do so does not necessarily constitute prejudicial error. Indeed, given the Supreme Court's commonsense positions, the default expectation is that the failure to sanitize a plea agreement is not

prejudicial. Rather, additional facts such as improper argument, flawed instructions, or some aspect of the proceedings that could reasonably sway the jury from its obligation to independently determine the credibility of witnesses are required to demonstrate error.

In this case, there is no dispute that the court properly instructed the jury on its role in determining the credibility of witnesses. Further, the record shows the trial court conscientiously admonished the jury each time the terms of the plea agreements were discussed with the witnesses, reminding the jury of their obligation to determine what evidence to believe was not affected by the agreements. And the closing arguments contained no argument that the court had made any credibility determinations at that point, although they did not clarify the potential confusion raised by the plea agreements and did not contain a similar argument to *Fauber* that made clear any future dispute would be decided by the judge. Taking the record as a whole, we conclude that even if admitting the unsanitized plea agreement terms is considered erroneous, similar to *Fauber*, the jury could not have reasonably construed those terms to relieve them of their obligation to independently determine the credibility of the witnesses and, thus, there is no possibility appellant was prejudiced by their admission.

## *Appellant's Sentence is Not Cruel and Unusual*

Appellant next argues that a life sentence without the possibility of parole is a cruel and unusual punishment in this case. Specifically, appellant contends that the jury's inability to find that he intentionally used a firearm demonstrates that the shooting was unintentional. Relying on his youth, at 22 years of age, and lack of a significant prior criminal history, appellant contends that life without the possibility of parole is cruel and unusual in these circumstances. Appellant concedes that this argument was not raised before the trial court but contends this court may take up the claim on appeal regardless, and, if this court deems the argument waived, argues the waiver constitutes ineffective assistance of counsel.

9.

We need not resolve whether this claim should be considered waived. Even if it were, we would find no error under an ineffective assistance of counsel claim because the facts of this case do not demonstrate a life sentence without the possibility of parole is a cruel and unusual punishment.

*Standard of Review and Applicable Law*

" ' "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" [Citation.] Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity. [Citation.]' [Citation.]

" ' "To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." ' " (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217–1218.)

*Analysis*

We note at the outset that while the individualized nature of the analysis means there are no cases exactly matching appellant's factual situation, other cases in similar contexts have found a life sentence without the possibility of parole was not a cruel and

10.

unusual punishment for a young adult involved in an unintentional killing.  One example is *People v. Young* (1992) 11 Cal.App.4th 1299 (*Young*).  In *Young*, the defendant participated in a planned robbery at gunpoint.  Later, during a high-speed chase while attempting to escape from the robbery, he drove recklessly and killed a bystander which resulted in a first degree felony murder conviction.  (*Id*. at p. 1309.)  The court noted that the killing was unintentional, that the defendant was only 19 years old at the time, and that he had a minimal prior criminal record for a drug crime,[2] but still rejected the defendant's claim a life sentence was cruel and unusual punishment.  (*Young*, at pp. 1310–1311.)

Turning to the facts of this case, appellant was a 22-year-old with his only prior criminal history consisting of a misdemeanor drug offense for which he received a deferred entry of judgment.  However, his crime was far from unsophisticated.  Appellant conspired with two other individuals to rob a specific target.  The three obtained a firearm, which appellant took possession of, and traveled together to the target's home.  They discussed the plan in advance and attempted to carry it out, intending for the firearm to be used in the crime.  While appellant's intent in firing the fatal shot was contested, the evidence showed he prepared to use the gun prior to the door being opened and whether through fear, surprise, or intentional conduct fired a single shot from close range into the head of his victim.  Finally, by the time of sentencing, the trial court concluded appellant had no remorse for his actions.

While appellant was young at the time of the crime, he was an adult, a relevant line our society has rightly drawn in differentiating culpability.  (See *People v. Abundio*, *supra*, 221 Cal.App.4th at p. 1221 [" 'Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next

---

[2]    The court also noted the defendant had additional arrests that did not lead to convictions or sustained juvenile petitions.  (*Young*, *supra*, 11 Cal.App.4th at p. 1310.)

defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes' "].) While appellant contends our shifting sense of morality lessens culpability for youthful adults, we see nothing in the case law or appellant's arguments that would convince us that a life sentence for taking the life of another during an armed robbery shocks the conscience when the perpetrator is 22 years old at the time of the offense. Indeed, the youth offender parole statute excludes those over the age of 18 years from its procedures when the underlying sentence is life without the possibility of parole. (§ 3051, subd. (b)(4).) Finally, the record does not show that appellant's mental state was below that expected of a 22-year-old offender. (See *Abundio*, at p. 1220 [noting lack of evidence that the defendant was by moral standards a minor].)

Considered in total, the record does not demonstrate appellant's sentence is grossly disproportionate to the nature of the offense or to appellant's culpability. We thus reject his claim it constitutes a cruel and unusual punishment.

## DISPOSITION

The judgment is affirmed.


HILL, P.J.

WE CONCUR:


SMITH, J.


DESANTOS, J.


12.