Filed 5/1/14  P. v. Escobedo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GERARDO DEJESUS ESCOBEDO,<br><br>    Defendant and Appellant. | D062918<br><br><br>(Super. Ct. No. SCN295204) |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed as modified.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Gerardo DeJesus Escobedo of 14 counts of committing a lewd and lascivious act on a child under the age of 14 years (Pen. Code, § 288, subd. (a).)[1] As to eight of the counts, the jury found true allegations the crime involved substantial sexual conduct with the victim (§ 1203.066, subd. (a)(8)). As to all of the counts, the jury found true allegations the crimes were committed against more than one victim (§§ 667.61, subds. (b), (c) & (e); 1203.066, subd. (a)(7)). The court sentenced him to consecutive terms of 15 years to life in prison for each count, for an aggregate sentence of 210 years to life. The court also imposed various fines and fees, including a laboratory analysis fee of $190 (Health & Saf. Code, § 11372.5, subd. (a)) and a drug program fee of $570 (Health & Saf. Code, § 11372.7, subd. (a)).

Escobedo appeals, contending the victims' generic testimony deprived him of due process, a fair trial, and the opportunity to present an alibi defense. Alternatively, he contends the victims' generic testimony provided insufficient evidence to support his convictions. He additionally contends the court abused its discretion in ordering his sentence for each count to be served consecutively. Alternatively, he contends his sentence violates the federal and state constitutional protections against cruel and/or unusual punishment. Lastly, he contends the court erred in imposing laboratory analysis and drug program fees as he was not convicted of any drug-related offenses.

---

[1] Further statutory references are to the Penal Code.

The People concede and we agree the court was not authorized to impose laboratory analysis and drug program fees in this case. Consequently, we modify the judgment to strike these fees. We affirm the judgment in all other respects.

BACKGROUND

*Prosecution Evidence*

During the time span in which the molestations at issue in this appeal occurred, Escobedo lived at various places. These places included the Paseo del Prado Apartments (Paseo), the Friendly Hills Mobile Manor (Friendly Hills), and the Cross Creek Apartments (Cross Creek).

*Offenses Against A.* (*Counts 1-5*)

A. is Escobedo's niece. When A. was in elementary and middle school, Escobedo's wife took care of her and her siblings after school and during the summers. Escobedo worked, but was sometimes there.

While Escobedo lived at Friendly Hills, he said inappropriate things to A. A. specifically recalled him telling her "he wanted to put his hotdog in [her] bun." At the time, he was trying to get her to come to him and lie down with him.

While Escobedo lived at Friendly Hills and at Cross Creek, he came up behind her, put his arms around her, and massaged her vaginal area over her clothing with one of his hands. Sometimes he also used the other hand to massage her breasts over her clothing. This touching occurred "a lot of the time," but never when Escobedo's wife was around. The touching stopped when the Escobedos stopped babysitting her.

3

Once at Cross Creek, Escobedo strapped her to an inversion table and grabbed her breast while flipping her over. Another time at Cross Creek, he came out of the shower with a towel wrapped around him. He saw her standing in the hallway, took the towel off, and exposed himself to her.

Once, when A. was 13, Escobedo came over to her house to pick up some tools. As she sat at the computer, he walked over to her, grabbed and massaged her breast, and started walking away. She became angry and threw something at him. He became angry, went back over to her, grabbed and massaged her breast again, and then left.

A. did not tell anyone about these incidents when they occurred. In addition, after A.'s cousin, K., came forward (see summary, *post*), an investigator questioned A. and A. denied Escobedo had engaged in any inappropriate conduct with her. She lied because she did not want to harm Escobedo's wife and daughter. A week after lying to the investigator, she told a friend the truth. With the friend's encouragement, she told her mother and eventually her father. The friend, who was a mandated reporter, notified the police.

*Offenses Against S. (Counts 6-11)*

S. is A.'s brother. Once around the time S. was in second grade and Escobedo was living at Paseo, Escobedo played a game with S. Escobedo had S. close his eyes, then Escobedo took S.'s hand and placed it on one of Escobedo's body parts and asked S. to guess what body part it was. Eventually, Escobedo placed S.'s hand on Escobedo's genital area over Escobedo's clothing. Escobedo told S. "there was no difference between touchings. Touching is touching, and it doesn't matter where it is."

4

Multiple times from when S. was in the second grade until S. was in the fifth or sixth grade, at Paseo, Friendly Hills, and Cross Creek, Escobedo would put his hand on S.'s genital area over S.'s clothing and grope, or massage, S.'s genitals. Sometimes when this occurred, Escobedo would ask S. to touch him and S. would put his hands on Escobedo's genitals over Escobedo's clothing.

Several times at Friendly Hills and Cross Creek, Escobedo "flashed" S. and his siblings. During some of these instances, Escobedo stroked his own penis. Once after Escobedo flashed S. at Friendly Hills, S. followed Escobedo into the bathroom and saw Escobedo masturbating himself over the sink. Escobedo asked S. to stroke Escobedo's penis and S. did. Escobedo then continued to masturbate himself to the point of ejaculation.

Another time at Friendly Hills, Escobedo massaged S. as S. laid belly down across Escobedo's lap. As the massage progressed from S.'s shoulders downward, Escobedo reached between S.'s legs and groped S.'s genital area. On a different occasion at Friendly Hills, Escobedo asked to see S.'s penis and S. unzipped his pants. Escobedo stroked S.'s penis and remarked at S. getting an erection because Escobedo did not think S. could get an erection. S. also remembered seeing Escobedo hug A. from behind at Friendly Hills and asking her if he could "put [his] hotdog in [her] buns."

Once at Cross Creek, Escobedo groped S.'s genitals as the two were watching television with a blanket over them. Another time when S. stayed overnight at Cross Creek, Escobedo turned on a pornographic channel and then reached over and groped S. while S. slept on the couch.

On more than one occasion at Cross Creek, when S. was showering after swimming, Escobedo opened the shower door, asked to see S.'s penis, and then masturbated S. to the point of ejaculation. Once Escobedo also masturbated S. while S. stood over the toilet.

S. did not tell anyone about the incidents when they occurred. During his freshman and sophomore years in high school, he told some friends and, in his sophomore year, he told his mom. He also wrote about the matter in a college application essay, which he discussed with two teachers. He did not formally report the incidents until after K. and A. came forward.

*Offenses Against K.* (*Counts 12-14*)

K. is Escobedo's niece and A. and S.'s cousin. When she was younger, Escobedo's wife sometimes babysat her during the summers when her parents worked. One day one summer when K. was eight or nine, she was at Cross Creek in the living room. Escobedo's wife and young daughter were in the bathroom. Escobedo called her over to the kitchen area. When she got there, he hugged her tightly from behind and rubbed her chest over her clothing with one of his hands. She told him to let go of her and tried to pull away from him, but he would not let her go and whispered "shoosh" into her ear.

6

He released her after the bathroom doorknob rattled. K. could not remember what month or day the incident occurred, and she did not report the incident to anyone at the time.

Another time the same summer, K. was in the pool. Escobedo, his wife, his daughter, and some other family members were there as well. Escobedo offered to teach K. to swim. While she lay atop his arms, he slipped his fingers under her bathing suit top and caressed the right side of her chest. She told him to stop and tried to roll off of him. He held onto her waist until she pushed on his arm and fell off. She did not report the incident at the time.

Another summer at Cross Creek, she and Escobedo's daughter were seated in chairs next to one another playing a video game on the computer when Escobedo, shirtless, came up behind his daughter's chair and ask for K.'s hand. K. asked, "Why?" He responded that he wanted to do something. She gave him her hand and he grabbed her wrist and started pulling it toward his groin. She tried to pull away and balled her hand up into a fist. He pulled harder until her knuckles touched his groin over his clothes. She asked Escobedo's daughter to tell Escobedo to let go of her. Escobedo's daughter got up and hit Escobedo. He released K. and left. K. did not remember what day or month the incident occurred, and she did not report it to anyone at the time.

When K. was 12, she was at another aunt's apartment with her mother and other family members, including Escobedo. Escobedo again grabbed her wrist and started pulling her arm toward him until her knuckles touched his groin over his clothing. As he tried to get her to rub his groin area, she tried to pull and claw herself away while also attempting to block the view of Escobedo's daughter, who was sitting next to Escobedo.

7

When her efforts to free herself did not work, she asked Escobedo's daughter to assist her in a way that sounded like they were playing a game. Escobedo's daughter punched and slapped Escobedo until he let go of K. K. did not report the incident to her mother at the time.

A., S., and K. never spoke to one another about their molestations. However, about a year before trial, K. told two relatives about the incidents involving her and one of the relatives helped her tell her mother. Sometime after K. told her mother about the incidents, Escobedo left a phone message stating that if he had done anything to K., he had done it unconsciously.

During a phone conversation with a police detective a few months after K. reported the incidents, Escobedo made contradictory statements. He initially denied each incident and told the detective there was never any opportunity for the incidents to have occurred. Although he acknowledged his wife babysat K. during the summer, he said he was never there. He later said he was sometimes there.

Regarding the kitchen incident, he said the kitchen was always crowded and he was never alone with K. He said one time he noticed a mark on her wrist and grabbed her wrist and pulled her toward him to examine it. He also said she was frightened by his actions and left the kitchen.

Regarding the pool incident, he initially stated he regularly went to the pool with his family, then he stated he only went to the pool with his daughter, then he stated he never went into the pool because of a shoulder injury, and then he stated he never went into the pool because he was embarrassed about the condition of his feet. Eventually he

8

stated that he had been in the pool with K. and did come in contact with her, but she must have misunderstood what was happening.

During a subsequent in-person interview with the detective, Escobedo denied having any contact with K., except in the kitchen when he grabbed her wrist. Regarding the incident when K. was 12, he initially denied having any contact with K. Then, after a break in the interview, he told the detective he had performed a magic trick for K. and some other kids. The trick involved placing torn up tissue in his pocket and then retrieving an intact tissue. He said K. tried to grab the tissue out of his pocket and he grabbed her hand. He pulled her hand to his groin and held it there for several seconds. She tried to pull her hand away, but he kept it near his crotch until she asked his daughter to help her get free. At that point, he realized what was happening and let her go.

Regarding the computer incident, he initially denied having any contact with K. However, as the conversation progressed he said he may have accidentally bumped into her. In a separate in-person interview a few days later, he recalled having been in the computer room under circumstances identical to those described by K. and he said he might have bumped up against K. while reaching between the chairs to pull out the keyboard tray. He also said there had been times when he had poked her in the chest with his finger.

An expert in child sexual abuse syndrome testified false accusations of child sexual abuse are uncommon. She explained children have a difficult time disclosing sexual abuse and, when they do disclose it, their disclosure is often significantly delayed. Delayed disclosure was the most common presentation of sexual abuse. In addition,

9

child molesters are usually well known to their victims, have spent time building relationships with their victims, and have groomed their victims to accept the abuse.

When a child decides to disclose and the child has been molested multiple times or over a long period of time, the child may not be able to recount the version of events in one interview. This is because the child may not have developed enough trust to recount everything in the first interview, or the child may remember additional information as time goes by.

It is not unusual for sexually abused children to initially deny the abuse. In addition, when a child has been subjected to ongoing abuse by the same person in the same location, the child's ability to remember each specific episode of abuse is highly diminished. Children have a difficult time with the concept of "when." Consequently, the timing of the abuse may need to be determined from contextual details such as where the abuse happened, where the child was living at the time, or what school he or she attended when it happened.

*Defense Evidence*

Escobedo's daughter testified her mother sometimes babysat for A. and S. and sometimes babysat for K. She did not remember whether Escobedo was ever there when her mother babysat K. He was there a couple of times when her mother babysat A. and S. She did not remember ever seeing any inappropriate behavior between Escobedo and A., S., or K. She also never heard him say anything sexual to them. In addition, she denied her mother babysat A. and S. on a regular basis, she denied ever playing a computer game with K., and she denied ever going to the pool with K. or with Escobedo.

10

Escobedo's wife testified she babysat K. two or three times a year. She denied ever watching K. during summers. She also denied ever seeing Escobedo touch or hear him talk to K. inappropriately. She said he hardly ever went to the pool and never went with K.

She babysat A. and S. two or three times a week after school or when they were on vacation. Escobedo worked most of the time, but sometimes would be home. He was never alone with A. and S. and never babysat them when she was not there. She never saw him touch or heard him say anything inappropriate to them.

DISCUSSION

I

*Generic Testimony*

A

The People separated the charges against Escobedo based on the victim and the date range in which the alleged conduct occurred. For A. and S., the People also separated the charges based on the location where the alleged conduct occurred, and for K., the People separated the charges based on the type of conduct.

Specifically, for A., the People charged Escobedo with one count occurring between August 11, 2006, and August 10, 2008, at A.'s home (count 1); one count for a first time occurring between April 19, 2003, and June 30, 2008, at Cross Creek (count 2); one count for a last time between the same dates and at the same location (count 3); one count for a first time occurring between February 21, 2002, and April 18, 2003, at Friendly Hills (count 4); and one count for a last time occurring between the same dates

11

and at the same location (count 5). For S., the People charged Escobedo with one count for a first time occurring between January 1, 1997, and February 20, 2002, at Paseo (count 6); one count for a last time occurring between the same dates and at the same location (count 7); one count for a first time occurring between February 21, 2002, and April 18, 2003, at Friendly Hills (count 8); one count for a last time occurring between the same dates and at the same location (count 9); one count for a first time occurring between April 19, 2003 and June 30, 2008, at Cross Creek (count 10); and one count for a last time occurring between the same dates and at the same location (count 11). Finally, for K., the People charged Escobedo with one count of touching K.'s body between April 1, 2005 and January 1, 2011 (count 12); one count for a first time of pulling K.'s hand onto his body between the same time period (count 13); and one count for a last time of pulling K.'s hand onto his body between the same time period (count 14).

The court subsequently instructed the jury, "The defendant is charged with a lewd or lascivious act on a child under the age of 14 years in count one sometime during the period of August 11, 2006 and August 10, 2008. The defendant is charged with a lewd or lascivious act on a child under the age of 14 years in counts two, three, ten and eleven sometime during the period of April 19, 2003 and June 30, 2008. The defendant is charged with a lewd or lascivious act on a child under the age of 14 years in counts four, five, eight, and nine sometime during the period of February 21, 2002 and April 18, 2003. The defendant is charged with a lewd or lascivious act on a child under the age of 14 years in counts six and seven sometime during the period of January 1st, 1997 and February 20, 2002. The defendant is charged with [a] lewd or lascivious act on a child

12

under the age of 14 in counts 12, 13 and 14 sometime during the period of April 1st, 2005 and January 1, 2011.

"The People have presented evidence of more than one act to prove that the defendant committed these offenses.  You must not find the defendant guilty unless: [¶]  Number one, you all agree the People have proved that the defendant committed at least one of these acts, and you all agree on which act he committed for each offense; or number two, you all agree that the People have proved that the defendant committed all of the acts alleged to have occurred during the period, and . . . have proved that the defendant committed at least the number of offenses charged."

B

1

Escobedo contends we must reverse his convictions because the prosecution's use of nonspecific or "generic" testimony deprived him of his rights to due process and a fair trial.  Although this contention was previously rejected by the California Supreme Court in *People v. Jones* (1990) 51 Cal.3d 294, 316-319 (*Jones*), Escobedo contends *Jones* only applies to "resident child molester" cases and this is not such a case because he never lived with any of the victims and never had uninterrupted or continual access to them. We disagree.

As the People point out, in the analogous crime of continuous sexual abuse of a minor (§ 288.5), "continuous access" is synonymous with "recurring access" and simply means the defendant has "an ongoing ability to approach and contact [the victim] time after time."  (*People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547.)  The purpose of

13

section 288.5 is to assure " 'resident' child molesters and others who repeatedly abuse a child over a prolonged period of time would not escape prosecution because of difficulties in pleading and proving with sufficient precision the dates, times, and particular nature of each molestation." (*People v. Rodriguez*, at p. 549.) The rules developed in *Jones* were intended to address the same problem. (*Jones*, *supra*, 51 Cal.3d at p. 305 ["any constitutional principles or evidentiary standards we develop should attempt to assure that the resident child molester is not immunized from substantial criminal liability merely because he has repeatedly molested his victim over an extended period of time"].) Accordingly, we cannot fathom any rational basis for defining "continuous access" differently when applying *Jones* than when applying section 288.5. As the evidence shows Escobedo had an ongoing ability to approach and contact each of the victims, we conclude *Jones* applies here.

2

Escobedo also contends we must reverse his conviction because the date ranges for charges were not narrow enough to allow for an alibi defense. This contention was also addressed and rejected in the *Jones* case. The *Jones* court recognized a criminal defendant generally has no right to notice of the specific time or place of an offense, provided the offense occurred within the applicable limitations period. (*Jones*, *supra*, 51 Cal.3d at p. 317.) The court also recognized identity and alibi defenses can rarely be raised in cases where the defendant had recurring access to and engaged in ongoing molestation of the victims. (*Id.* at p. 319.) Instead, the trial usually centers on the parties' respective credibility. (*Ibid.*)

14

Nonetheless, Escobedo was able to assert an alibi defense in this case by presenting testimony from his wife, who insisted Escobedo never went swimming with K. and was never alone with any of victims at any time. As the *Jones* court explained, "[W]hen an alibi defense is tendered, there is no reason why the jury would be less inclined to credit the defense as applied to appropriate counts, merely because the victim's generic testimony has implicated the defendant in additional counts or offenses not challenged by the alibi. Indeed, the fact that the defendant has established an alibi covering some of the time periods alleged in the information could significantly undermine the victim's testimony as to the remaining counts." (*Jones*, *supra*, 51 Cal.3d at p. 319.)

Moreover, Escobedo also had other reasonable defense avenues available to him, including testifying on his own behalf and directly denying any wrongdoing, cross-examining prosecution witnesses, presenting expert character evidence, introducing evidence of the victims' past fabrications, and offering innocent explanations for the victims' knowledge of sexual behavior or of his physical characteristics. (*Jones*, *supra*, 51 Cal.3d at p. 320.) Escobedo, therefore, has not established the victims' generic testimony deprived him of a reasonable opportunity to defend the charges against him.

15

Solely for purposes of collateral federal court review, Escobedo contends *Jones* was wrongly decided for the reasons stated in Justice Mosk's dissenting opinion in the case.  (*Jones*, *supra*, 51 Cal.3d at pp. 323-335.)  We need not address this contention because, as Escobedo acknowledges, the *Jones* case is binding on us.  (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.)

## C

Escobedo alternatively contends there is insufficient evidence to support his convictions.  When deciding a claim of insufficient evidence in a criminal case, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.]  "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.   ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]"  [Citation.]'  [Citations.]  The conviction shall stand 'unless it appears "that

upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

A victim's statements may support a conviction under section 288, subdivision (a), if the statements "describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy).  Moreover, the victim must describe *the number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping').  Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period.  Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Jones*, *supra*, 51 Cal.3d at p. 316.)

Here, each of the three victims testified to specific types of conduct, including masturbation, breast massaging, and genital massaging.  In addition, each testified the conduct occurred at particular locations either once or repeatedly and they identified their approximate ages, grades, and the general time period (i.e., after school or during the summer) when the conduct occurred.  To further establish the timing of the conduct, the prosecutor introduced evidence of when Escobedo lived at the locations where the conduct occurred.  Moreover, Escobedo admitted to a detective that physical contact with

17

K. occurred. Collectively, this evidence is sufficient to establish each of the charges for which Escobedo was convicted. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 557 [defendant may be constitutionally convicted of child molestation based on "generic evidence describing (1) the kind of acts committed, (2) the number of acts committed with sufficient certainty to support the alleged counts, and (3) the general time period in which the acts occurred"]; *People v. Matute* (2002) 103 Cal.App.4th 1437, 1446 ["[I]n child molestation cases, as long as the victim specifies the type of conduct involved, its frequency, and that the conduct occurred during the limitation period, nothing more is required to establish the substantiality of the victim's testimony"].)

II

*Consecutive Sentences*

A

The parties agree the court was obliged to impose an indeterminate term of 15 years to life for each of Escobedo's offenses. (*People v. Wutzke* (2002) 28 Cal.4th 923, 930; *People v. Valdez* (2011) 193 Cal.App.4th 1515, 1521; *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1261-1262.) The parties also agree the court had the discretion to impose the sentences concurrently or to impose some or all of them consecutively. (*People v. Valdez*, at p. 1524; *People v. Rodriguez*, at pp. 1262-1263.)

At the outset of the sentencing hearing, the court explained that, when deciding whether to impose concurrent or consecutive sentences, "One of the things I always look at is whether there is an adequate opportunity to stop doing what you're doing or not, and if there is no real opportunity, it would seem to me you ought to run them concurrently,

18

and if there is that adequate opportunity to reflect upon what you are doing, then they ought to run consecutive."

During the sentencing hearing, the parties raised and the court considered a variety of factors, including whether Escobedo committed the crimes at separate times and places, whether he had an adequate opportunity between his crimes to reflect upon and stop his conduct, the nature and severity of his conduct, the vulnerability of the victims, his relationship to the victims, and his lack of a prior criminal history. The court also considered the information contained in the probation officer's report, including the result of a risk assessment indicating Escobedo posed a low recidivism risk. However, the court did not accord any weight to the assessment result, finding it "unbelievable" since Escobedo committed multiple offenses against multiple victims.[2]

In reaching its sentencing decision, the court recognized "there is a certain silliness maybe in going 210 to life, because absent something extremely unusual, that's not going to occur." (Italics omitted.) However, the court also recognized the Legislature established the sentencing scheme and "it does lead every once in a while to these that you see of this 210, 400 and something." The court went on to state, "Minimum, it would

_____

[2]     One of the factors considered in the assessment was Escobedo's age. The assessment result was based on Escobedo's age being "60 or older." He was actually 48 years old at the time of the assessment. Although the probation officer's report discusses some of the methodology for the assessment, it does not explain this discrepancy or suggest it was intentional. Statistically, the risk of sexual reoffense decreases with age and the risk assessment is intended to account for this decrease. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1341, fn. 4.) Consequently, we presume the result of the risk assessment would have been less favorable to Escobedo had the result been based on his actual age; however, we do not know the precise effect of the discrepancy.

19

seem to me, is 45 to life, and that's each victim, 15 to life, but then what about all of these counts over a long period of time, different locations, opportunities to stop. [¶] That's where I am thinking, that this is a 210 to life, as silly as that may sound."

Ultimately, the court selected the 210 years to life option. The court explained, "I have given this one some thought. I mean, I think there are really three alternatives here for me: 15 to life, 45 to life, or 210 to life. And I agree with you on many of the things you said, counsel, meaning defense counsel. What we see in this courthouse is usually a lot worse than this. It involves insertions and oral copulations and sometimes use of guns and knives to carry out the nefarious activities. [¶] And I took very much to heart what you put in the Statement of Mitigation on page 3, and I think that pretty well analyzes it. [¶] And then I went over my notes again last night just to make sure that at least in my own mind, I am satisfied in doing the right thing. And I am just looking at the number of times, the different locations, and the different victims. And I just can't see that this should be anything less than 210 to life." The court went on to express that even though Escobedo would likely never get out of prison regardless of the sentence imposed, "I think he deserves [a sentence of 210 years to life]. That's basically what it comes down to. Mr. Escobedo, you just deserve it."

B

Escobedo contends the court erred in imposing consecutive sentences because his conduct did not warrant consecutive sentences, he has no prior criminal history, and the risk assessment showed he posed a low recidivism risk. We are not persuaded by this contention.

"[A] trial court has discretion to determine whether several sentences are to run concurrently or consecutively. [Citations.] In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal. [Citations.] Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Bradford* (1976) 17 Cal.3d 8, 20.)

In determining whether to impose consecutive sentences, a court may consider whether: "(1) The crimes and their objectives were predominantly independent of each other; [¶] . . . or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." (Cal. Rules of Court, rule 4.425(a); *People v. Rodriguez*, *supra*, 130 Cal.App.4th at p. 1262.)[3] The court may also consider other aggravating and mitigating circumstances, except a fact used to impose an upper term, a fact used to otherwise enhance the sentence, or a fact that was an element of the crime. (Rule 4.425(b).) Aggravating factors may include the victims' vulnerability, the level of planning and sophistication involved in the crimes, and the use of a position of trust to commit the

---

3      Further rule references are to the California Rules of Court.

crimes. (Rule 4.421(a)(3), (8), & (11).) Mitigating factors may include a lack of a prior criminal record. (Rule 4.423(b)(1).)

Here, the record shows the court considered numerous aggravating and mitigating factors, including the nature and severity of Escobedo's conduct, his lack of a prior criminal history, and the result of the risk assessment. The court ultimately rested its decision on the fact Escobedo committed his crimes against different victims at different times and places. This factor is an appropriate factor for imposing consecutive sentences (Rule 4.425(a)(3)), and Escobedo has not supplied any authority indicating the court's primary reliance on this factor was outside the bounds of the court's discretion. Indeed, the imposition of consecutive sentences does not require a court finding of any aggravating circumstances. (*People v. Black* (2007) 41 Cal.4th 799, 822 [a court may consider aggravating and mitigating factors, but it is not required to find any aggravating circumstance exists to justify imposing consecutive terms].)

Escobedo criticizes the court's failure to give proper weight to the mitigating factors, including the risk assessment result, and impose a sentence that would give him at least an opportunity for parole in his lifetime. However, he has not cited any authority obliging the court to accord any factor any particular weight. To the contrary, "[t]he process of weighing the relative merits of the aggravating and mitigating factors is for the trial court; we do not substitute our judgment on such matters." (*People v. Calderon* (1993) 20 Cal.App.4th 82, 87, fn. omitted.) He also has not cited any authority, nor are we aware of any, requiring the court to ensure its sentence would allow him the

22

opportunity for parole in his lifetime. Accordingly, Escobedo has not established the court's decision to impose consecutive sentences exceeded the bounds of reason.

C

Escobedo alternatively contends the imposition of sentence of 210 years to life constitutes cruel and unusual punishment. We are not persuaded by this contention either.

" ' "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" [Citation.] Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217-1218.)

" 'To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], so that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the

23

sentence as unconstitutional.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1300.)  The standard is the same under the federal constitution.  (*Ibid.*)

Escobedo's sentence is the functional equivalent of a sentence of life without the possibility of parole.  (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1016; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.)  "[I]mposition of a sentence of life without the possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal constitution." (*People v. Byrd*, *supra*, at p. 1383.)  This is an appropriate case.

Escobedo repeatedly molested three children with whom he had both a familial and caretaker relationship.  The conduct occurred at multiple locations over a 14-year period.  It was blatantly sexual and included over-the-clothes touching, under-the-clothes touching, and masturbation.  All of the victims were vulnerable because of their youth and Escobedo's position of trust and authority in their lives.  All of the victims were traumatized by the conduct as evidenced by their attempts to block their memories of it. At least one of the victims was continuing to experience flashbacks at the time of trial.

In countering these circumstances, Escobedo emphasizes his lack of a prior criminal history and his low score on the risk assessment.  These two points are closely connected as six of the 11 factors considered in the risk assessment involved Escobedo's prior criminal history.  Although these points are favorable to Escobedo, they do not significantly diminish his culpability given his choice of victims.  Their particular vulnerability and corresponding reluctance to report his conduct delayed its detection and

24

his accountability for more than a decade.  To accord him appreciable credit for not having been caught sooner or more often would effectively reward him for targeting young children, which we decline to do.  Moreover, because Escobedo committed multiple molestations against multiple victims over a 14-year time span, we cannot conclude from his absence of a prior criminal history that his conduct was in any way out of character or aberrational.  Accordingly, Escobedo has not established a sentence of life without the possibility of parole in this case shocks the conscience, offends fundamental notions of human dignity or is grossly disproportionate to his individual culpability.

III

*Laboratory Analysis and Drug Program Fees*

As part of Escobedo's sentence, the court imposed laboratory analysis and drug program fees.  These fees only apply to defendants who are convicted of drug-related offenses.  (Health & Saf. Code, §§ 11372.5, subd. (a), 11372.7, subd. (a).)  Escobedo contends we must reverse these fees because he was not convicted of a drug-related offense.  The People concede and we agree the court was not authorized to impose these fees in this case.  We will, therefore, modify the judgment to strike these fees.  (§ 1260; *People v. Thomas* (2012) 53 Cal.4th 771, 837 [an appellate court may modify the judgment to correct an unauthorized sentence].)

25

DISPOSITION

The judgment is modified to strike the lab analysis and drug program fees.  The trial court is directed to amend the abstract of judgment accordingly and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                                     McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


McINTYRE, J.