Filed 7/27/21  P. v. Garcia CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075995 |
| v. | (Super.Ct.No. 16CR003124) |
| DAMIAN GARCIA, | ORDER MODIFYING OPINION AND DENY PETITION FOR REHEARING |
| Defendant and Appellant. | |
| | [NO CHANGE IN JUDGMENT] |

THE COURT

The petition for rehearing filed on July 22, 2021 is denied.  The opinion filed in this matter on July 21, 2021 is modified as follows.

1.  On page 5, in the first full paragraph, at the end of the sentence, "Officers were unable to perform full field sobriety tests because defendant 'couldn't stay awake for more than 10 minutes,'" add the following as new footnote 1:

> [1]    Defendant disputes our statement that he could not stay awake for more than 10 minutes, and thus that he was "uncontrollably sleepy," while driving.  He admits that he was going "in and out of consciousness," but only after his blood was drawn at the hospital.
>
> Officer Koch testified that he considered conducting field sobriety tests but decided not to, because defendant "couldn't stay awake for longer than 10 minutes."  He did not

1

testify that this occurred at the hospital. It is reasonable to infer that he considered conducting field sobriety tests while in the field.

Officer Koch also specifically testified that, when he was considering conducting field sobriety tests, defendant's condition was "different from losing consciousness." By contrast, at the hospital, "a little after" defendant's blood was drawn, defendant did "start[] losing consciousness." This confirms that defendant was already having difficulty staying awake sometime before his blood was drawn, at which point he became completely unconscious.

Last but not least, the blood draw occurred at 5:56 a.m. As defendant was losing consciousness then, the jurors could reasonably infer that he was already uncontrollably sleepy at 4:30 a.m., when the collision occurred.

2. On page 5, at the end of the third full paragraph, after the sentence, "Even though methamphetamine is a stimulant, a user who has been kept awake by it for too long may become uncontrollably sleepy," add the following as new footnote 2:

[2] Once again (see fn. 1), defendant disputes our use of the term "uncontrollably sleepy."

Bawardi was asked, "[I]f you had a person who had a substantial methamphetamine ingestion and a few minutes after the blood was drawn *this person was in and out of consciousness*, that would have to come from some source other than the methamphetamine, wouldn't it?" (Italics added.) She responded, "There is another effect that can occur with an individual methamphetamine user especially if they have been wakeful for long periods of time where a person can crash from the effect of the stimulant used even with a significant amount in their system." As this was Bawardi's explanation of how a person could be "in and out of consciousness," clearly that is what she meant by "crash." At a minimum, the jurors could so infer.

3. On page 10, at the beginning of the second full paragraph, delete the sentence

Here, defendant was so sleepy that he could not stay awake for more than 10 minutes.

2

And replace it with:

> Here, defendant was so sleepy that, after the crash, he
> could not stay awake for more than 10 minutes.

4. On page 15, renumber footnote 1 as footnote 3.

Except for these modifications, the opinion remains unchanged. This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

McKINSTER _____
J.

RAPHAEL _____
J.

cc:    See attached mailing list

MAILING LIST FOR CASE: E075995
The People v. Damian Garcia


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730


Anthony Da Silva
Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266


Jean Ballantine
12405 Venice Boulevard, PMB 139
Los Angeles, CA 90066


Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA  92101 2396

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075995 |
| v. | (Super.Ct.No. 16CR003124) |
| DAMIAN GARCIA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Dwight W. Moore, Judge.  Affirmed.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Damian Garcia led police on a high-speed pursuit while he was driving a stolen car, high on methamphetamine, and uncontrollably sleepy.  It was around

1

4:30 a.m., so there were very few other cars around.  The pursuit ended when defendant ran the red light at the end of a freeway offramp and broadsided a car in the intersection, killing the other driver.

In a jury trial, defendant was found guilty of second degree murder (Pen. Code, § 187, subd. (a)), evading an officer causing death (Veh. Code, § 2800.3, subd. (b), and driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)).  He was sentenced to a total of 18 years to life in prison, along with the usual fines, fees, and ancillary orders.

Defendant contends:

1.  There was insufficient evidence of implied malice to support the conviction for second degree murder.

2.  The trial court erred by denying defendant's request for a special instruction on implied malice.

We find no error.  Hence, we will affirm.

I

STATEMENT OF FACTS

"[P]retty late" on the night of March 7-8, 2016, a group of men robbed a teenager at an ATM and took his mother's black 2015 Nissan Sentra.

At an unknown time after midnight, defendant picked up his friend Richard Cerda.  Defendant was driving a Nissan.  Cerda suspected the car was stolen because he had never seen defendant driving it before.

2

Around 4:30 a.m., Officer Charles Vest was on patrol when he spotted the stolen Sentra near Baseline and Sierra Way in San Bernardino. He knew it was stolen, because he had seen it listed on a "hot sheet" of recently stolen vehicles. He also ran a records check on the license plate, which confirmed that it was stolen. He started following the Sentra. Meanwhile, he called for backup.

Officer Brandon Koch responded; he pulled up behind Officer Vest. Both officers turned on their red overhead lights and sirens. Instead of stopping, the Sentra accelerated away. While making a right turn at Mountain View and Wabash, the Sentra ran a stop sign and skidded briefly into the wrong lane. It ran three red lights — at Mountain View and Highland, 30th and Arrowhead, and 30th and E.

Throughout this surface street portion of the pursuit, the Sentra was going 60 to 70 miles an hour (except when it had to slow to make a turn), even in residential areas where the speed limit was 40 miles per hour. Cerda testified that he did not feel safe, "[b]ecause we were going fast."

Traffic was "light." There were no other vehicles on the road, except for two or three in the vicinity of a gas station at 30th and E. There were no pedestrians. At some of the intersections along the way, including 30th and Arrowhead, other officers stopped traffic, using their lights and sirens, to prevent a collision.

The Sentra got onto the southbound 215 Freeway. It was going from 70 to 120 miles an hour. There was "moderate" traffic on the freeway — some 10 to 15 cars within 300 yards. The Sentra took the Baseline offramp. At the end of the onramp, there was a

red light. The Sentra ran the red light at 90 miles an hour, then took the Baseline onramp back onto the freeway again.

The Sentra, now going 100 to 120 miles an hour, cut left, all the way across the freeway, into the carpool lane. Cerda testified that defendant was driving as fast as Cerda had ever gone in a car. The speed did not feel safe to him. The Sentra then "shot all the way [back] across the lanes" to the right and took the Fifth Street offramp. In doing so, it cut off several vehicles, forcing them to brake to avoid a collision. At that point, Officer Koch decided that "it was unsafe to continue this pursuit."

At the end of the offramp, there was a red light. The Sentra ran the red light. Just at that moment, a black Honda entered the intersection, headed east. The Sentra "T-bone[d]" the driver's side of the Honda. Cornelius Holly — the 33-year-old driver of the Honda — died within minutes.

The Sentra was equipped with a crash data recorder. It stored data for the five seconds before the collision. It showed that during the first four of those five seconds, defendant's speed decreased from 91 miles an hour to 63 miles an hour. During that time, he "was on the gas, came off onto the brakes briefly, then back on the gas again." In the last second before impact, he braked hard and steered to the right, reducing his speed still further to 43 miles an hour.

The Sentra's brakes and tires were in good working order.

The entire pursuit lasted approximately five minutes. During that time, Cerda told defendant three times to stop the car.

Defendant was arrested and taken to a hospital. Officers were unable to perform full field sobriety tests because defendant "couldn't stay awake for more than 10 minutes."

Defendant told medical personnel that he had recently used methamphetamine and marijuana. His blood tested positive for methamphetamine — 574 nanograms of methamphetamine and 133 nanograms of amphetamine (a metabolite) per milliliter. Most positive methamphetamine tests are between 100 and 500 nanograms per milliliter.

Ola Bawardi, an expert forensic toxicologist, testified that methamphetamine is a central nervous system stimulant. It can affect perception of time and speed. People under the influence of methamphetamine become easily distracted and unable to multitask. "[T]hey may make quick and erratic decisions." "[T]heir judgment can go to hell . . . [.]" Methamphetamine can loosen inhibitions and promote risk-taking. Users may experience a sense of euphoria and invulnerability. Even though methamphetamine is a stimulant, a user who has been kept awake by it for too long may become uncontrollably sleepy.

Bawardi admitted that there is "no clear scientific correlation[]" between blood level of methamphetamine and level of impairment.

II

THE SUFFICIENCY OF THE EVIDENCE OF IMPLIED MALICE

Defendant contends that there was insufficient evidence of implied malice to support his conviction for second degree murder.

5

"'We often address claims of insufficient evidence, and the standard of review is settled. "A reviewing court faced with such a claim determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"" [Citation.]" (*People v. Flinner* (2020) 10 Cal.5th 686, 748.)

"'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' [Citation.] 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] [¶] . . . 'We have interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' [Citation.]"' [Citation.]" (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

In *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), the Supreme Court compared the implied malice necessary for second degree murder to the gross negligence required for vehicular manslaughter.  It said:  "A finding of gross negligence is made by applying an *objective test*:  if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness.  [Citation.]  However, a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.  [Citation.]" (*Id*. at pp. 296-297.)

Here, there is no evidence that defendant had the intent to kill.  Accordingly, to support his conviction for murder, there must be sufficient evidence that he subjectively appreciated the risk to life that he created.

Cases have held that "a pattern of reckless driving immediately prior to a fatal accident may be indicative of [implied] malice." (*People v. Ricardi* (1990) 221 Cal.App.3d 249, 261, fn. 5.)

In *People v. Fuller* (1978) 86 Cal.App.3d 618, a police officer spotted the defendants as they were in the act of stealing tires from a car lot.  The defendants got into their car and attempted to make a getaway.  (*Id*. at pp. 621-622.)  "[A] high speed chase ensued which eventually resulted in [the defendants'] car running a red light . . . and striking another automobile which had entered the intersection.  The driver of the other automobile was killed. . . .  The chase from the car lot covered some seven miles and lasted approximately 10 to 12 minutes.  During the chase the [defendants'] car narrowly

7

missed colliding with several other cars including two police vehicles that were positioned to block their escape." (*Id*. at p. 622.)

The appellate court held that there was sufficient evidence of second degree implied malice murder. (*People v. Fuller*, *supra*, 86 Cal.App.3d at pp. 628-629.) It explained: "[The defendants] drove at high speeds through main thoroughfares . . . . At one point in the chase they drove on the wrong side of [the street] and caused oncoming cars to swerve off of the road to avoid a head-on collision. They then made a U-turn and sped back . . . , ran a red light and caused other traffic to stop to avoid a collision. [The defendants] then drove . . . at speeds estimated between 60 and 75 miles per hour and headed straight at two oncoming police vehicles which were attempting to block their flight. [The defendants] did not reduce their speed as they approached the officers' vehicles, and only a last minute maneuver by the officers avoided a possible fatal collision. At the next intersection [the defendants'] vehicle which 'hadn't slowed down very much' ran the red light and struck and killed the driver of the other car. Under these facts the foreseeability of serious injury or death was apparent to [the defendants]. [Citations.]" (*Id*. at p. 629.)

In *People v. Young* (1992) 11 Cal.App.4th 1299, the police pursued the defendant, who was driving a car that he had just carjacked. (*Id*. at pp. 1303-1304.) He went up to 70 miles an hour on main streets and 50 miles an hour on residential streets. He made a right turn on red without stopping, forcing cross-traffic to brake to avoid a collision. He "briefly" drove on the wrong side of the road, "causing several cars to veer to avoid

8

striking him." (*Id.* at p. 1304.) He ran three red lights; when he ran a fourth, he hit other cars, killing one person. (*Ibid.*) He was convicted of several offenses, including first degree felony murder. (*Id.* at p. 1302.)

In the course of discussing the defendant's claim of cruel and unusual punishment (*People v. Young*, *supra*, 11 Cal.App.4th at pp. 1308-1311), the appellate court stated: "[T]he . . . death of a bystander during appellant's reckless high-speed flight in the stolen vehicle involves an application of the felony-murder rule which is by no means bizarre or unforeseeable. . . . Although appellant attempts to characterize the death as resulting from 'accident,' *the pattern of appellant's driving supports the conclusion that appellant harbored a conscious disregard for human life which constituted implied malice*, sufficient to render the homicide a murder even without its connection to the prior robbery. [Citations.]" (*Id.* at p. 1309, italics added.)

In *People v. Moore* (2010) 187 Cal.App.4th 937, the defendant was driving 80 to 90 miles an hour in a 35-mile-an-hour zone. At one point, he crossed over the double yellow line, forcing drivers going in the opposite direction to move out of his way. While still going 70 miles an hour, he ran a red light and hit another car, killing a passenger. A jury found him guilty of, among other things, second degree murder. (*Id.* at p. 939.)

The appellate court held that there was sufficient evidence of implied malice. (*People v. Moore*, *supra*, 187 Cal.App.4th at pp. 940-942.) It acknowledged that: "The facts must demonstrate the defendant had a subjective awareness of the risk. [Citation.] It is not enough that a reasonable person would have been aware of the risk. [Citation.]"

(*Id*. at p. 941.)  The defendant sought to distinguish both *Watson* and *Fuller*, on the ground that there "a prior near-miss gave the defendant a warning."  (*Id*. at p. 942.) However, the court concluded that that distinction was not controlling.  (*Ibid*.)

It then stated:  "Here Moore drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes.  His actions went well beyond gross negligence.  He acted with wanton disregard of the near certainty that someone would be killed.  [¶]  Whether Moore was subjectively aware of the risk is best answered by the question:  how could he not be?  It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk."  (*People v. Moore*, *supra*, 187 Cal.App.4th at p. 941.)

Here, defendant was so sleepy that he could not stay awake for more than 10 minutes.  Nevertheless, he drove 70 miles an hour in residential areas where the speed limit was 40.  While still on surface streets, he ran one stop sign and three red lights without slowing.  When he ran the red light at 30th and E, there were two or three other cars on the road nearby, though fortunately there were none in the intersection.

During the freeway portion of the pursuit, defendant drove up to 120 miles an hour.  He ran another red light at the Baseline offramp going 90 miles an hour.  He swerved left across all of the lanes, even though traffic was moderate and there were 10 or 15 cars nearby.  He swerved right again, even though this meant cutting off other cars and forcing them to brake.

10

Finally, when he got off at Fifth Street, he slowed somewhat. He tapped the brakes briefly; inferably he was checking for traffic in the intersection but saw none. In the last second, inferably, he became aware of the Honda; he braked hard and tried to steer around it. In *Watson* itself, the Supreme Court noted, among other facts showing conscious disregard, that the defendant "belatedly . . . attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created." (*Watson*, *supra*, 30 Cal.3d at p. 301.)

Significantly, Cerda was aware of the danger. The Sentra was going faster than he had ever gone in a car in his life. He did not feel safe, "[b]ecause we were going fast." He kept telling defendant to stop. Likewise Officer Koch was aware of the danger. He decided to call off the pursuit at almost the same time as defendant started down the Fifth Street offramp, because it was too dangerous. As Cerda and Officer Koch were subjectively aware of the danger, it is reasonably inferable that defendant was, too. Indeed, much as in *Moore*, we may well ask: how could he not be?

Defendant argues that "[h]e did not nearly miss any vehicles or need to swerve to avoid collisions in his driving leading up to the crash." However, when he swerved on the freeway, other vehicles nearly missed *him* and had to brake suddenly to avoid a collision with *him*.

Defendant also argues that "[t]here was no evidence appellant had any prior DUI arrests or attended a DUI or equivalent program, or that he was ever involved in a prior

11

traffic accident." Such evidence, while probative, is not absolutely required. For example, there was no such evidence in *Fuller*, *Young*, or *Moore*.

Defendant notes that the toxicologist conceded that the level of methamphetamine in his system would not necessarily cause him to be under the influence. He was not convicted, however, of driving under the influence; he was convicted of second degree murder, which does not require either intoxication or impairment. As the prosecutor aptly noted below, most cases of vehicular implied malice murder involve *either* intoxication *or* evading. In any event, defendant *was* impaired, as shown by the fact that he could not stay awake.

Defendant complains that the analysis in *Moore* "confuses the subjective and objective elements of implied malice murder . . . ." But if a reasonable person, under the circumstances, would have been aware of the risk, it is a permissible inference that the defendant was aware. *Watson* itself indicated that subjective awareness can be inferred from objective obviousness when it stated: "'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.'" (*Watson*, *supra*, 30 Cal.3d at pp. 300-301.)

This in no way eliminates the subjective-objective distinction. A subjective standard differs from an objective standard in two respects. First, the jury is not *required* to infer subjective awareness from the fact that a reasonable person would have been

12

aware. Second, the jury can consider evidence that the defendant *lacked* subjective awareness. When implied malice is at issue, the defendant may take the stand and testify that he or she was not subjectively aware of the risk. And a defendant who does not testify may introduce evidence that, for particular personal reasons, he or she lacked the necessary subjective awareness. This distinguishes implied malice from gross negligence. (*Watson*, *supra*, 30 Cal.3d at p. 296 ["A finding of gross negligence is made by applying an *objective* test: if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness."].)

Here, for example, the evidence showed that police officers, using their lights and sirens, had blocked off some intersections to prevent a collision. The jury could have inferred that defendant expected them to have blocked off the intersection with Fifth Street, too. However, it was not required to do so, especially as there were no lights and sirens at Fifth Street and there had been none at Baseline.

We therefore concur with the reasoning in *Moore*. Under that reasoning, there was sufficient evidence that defendant was subjectively aware of the risk he was creating and acted with conscious disregard for life.

III

DEFENDANT'S REQUESTED INSTRUCTION ON IMPLIED MALICE

Defendant contends that the trial court erred by denying his request for a special instruction on implied malice.

13

A.     *Additional Factual and Procedural Background.*

Defendant requested the following instruction:

"Gross [n]egligence, however egregious, is not sufficient to support a finding of implied malice.

"The evidence must show that the [d]efendant, at the time he acted, actually knew that the natural and probable consequences of his act would be that at least one other person would be placed in imminent danger of death.

"Further[,] the test is not what a reasonable person in the defendant's position would have known, but what the defendant actually knew and understood."

The prosecutor objected to the instruction as argumentative, duplicative, improper, and irrelevant.

The trial court ruled that the instruction was unnecessary and confusing, because there were no other instructions on gross negligence or manslaughter.  It also ruled that the subject was adequately covered by the other instructions.

It did give CALCRIM No. 520, which provided, as relevant here:

"The defendant acted with malice aforethought if:

1.  He intentionally committed an act;

2.  The natural and probable consequences of his act were dangerous to human life;

3.  At the time he knew his act was dangerous to human life; [¶] and

4.  He deliberately acted with conscious disregard for life.  [¶]  . . .

14

" . . . A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."  (Capitalization altered.)[1]

B.      *Discussion.*

"The trial court must instruct the jury 'on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.'  [Citation.]"  (*People v. Anderson* (2018) 5 Cal.5th 372, 413.)

"'[A] criminal defendant is entitled, on request, to a[n] instruction "pinpointing" the theory of his defense.'  [Citation.]"  (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 851.)  "'[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.'  [Citation.]" (*People v. Scully* (2021) 11 Cal.5th 542, 592.)

---

[1]      During its deliberations, the jury asked for:  "Clarification on the 'act':  is it from the moment that life was lost, from the moments leading up to the death, or the entirety of the pursuit or any other definition of what the 'act' means."

The trial court responded:  "I cannot give you an exact answer to your question. [¶]  As used in the instructions, the word 'act' does not necessarily refer to a specific moment in time or any specific time interval.  It is for you to determine what act or acts occurred, and when they occurred.  [¶]  Please review Instruction 520 in its entirety as you discuss this."

15

Here, the first paragraph of the instruction was potentially confusing, because it did not define "gross negligence" and there were no other instructions regarding gross negligence.

In support of his proposed instruction, defendant quotes *Watson*, as follows: "A finding of gross negligence is made by applying an *objective* test: if a *reasonable* person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. [Citation.] However, a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*Watson*, *supra*, 30 Cal.3d at pp. 296-297.) The problem with the instruction, however, was precisely that it did not explain the difference between gross negligence and implied malice, in the way that this quotation from *Watson* does explain it.

CALCRIM No. 520 adequately conveyed the same concept without referring to gross negligence. It stated that defendant had to have "kn[own] his act was dangerous to human life." He also had to have "deliberately acted with conscious disregard for life." This formulation necessarily meant that the jury had to decide what defendant's actual mental state was; it was not sufficient that a reasonable person would have known that the act was dangerous to human life, if defendant did not.

Defendant notes that he was not entitled to instructions on involuntary or vehicular manslaughter as lesser included offenses. (See Pen. Code, § 192, subd. (b); *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1058; *People v. Munoz* (2019) 31 Cal.App.5th 143,

16

154.) He protests that as a result, in the absence of his proposed instruction, he was deprived of the ability to argue that his conduct was merely grossly negligent and did not rise to the level of conscious disregard. The first paragraph of the requested instruction, however, would not have helped him to argue this, because it did not define gross negligence.

We also note that defense counsel could and did raise this very argument in closing. He stated that his client's conduct "[wa]s the grossest of gross negligence. It [wa]s not murder." He identified the only disputed issue as: "When Mr. Garcia started up that off-ramp, was he conscious in his mind that what he was about to do would more than likely cause someone's death?" "It's not a question of what a reasonable person would have known. It's exactly what was in his mind at the time." CALCRIM No. 520 was a sufficient instructional basis for these arguments.

The second paragraph of the proposed instruction was legally incorrect. As already mentioned (see part II, *ante*), the physical component of implied malice is "'"'an act, the natural consequences of which are dangerous to life.' [Citation.] . . .'" [Citation.]" (*People v. Soto*, *supra*, 4 Cal.5th at p. 974.) The mental component is "'"'know[ledge] that [one's] conduct endangers the life of another and . . . act[ing] with conscious disregard for life.' [Citation.]"' [Citation.]" (*Ibid.*) However, there is no requirement that the defendant must know that his or her conduct is placing another person "in imminent danger of death." (See *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1310 ["An act is dangerous to life, for purposes of implied malice, when there is a

17

high probability it will result in death."].)  Moreover, the reference to "at least one other person" incorrectly suggests that the danger must be to a particular person, rather than to the public at large.  "Nowhere in its opinion did the *Watson* court suggest implied malice requires awareness of life-threatening risk to a particular person."  (*People v. Albright* (1985) 173 Cal.App.3d 883, 887.)

The third paragraph once again merely duplicated CALCRIM No. 520, which already stated that the defendant must have "kn[own] his act was dangerous to human life" and must have "deliberately acted with conscious disregard for life."

It follows that the trial court did not err by refusing to give defendant's requested instruction.

IV

DISPOSITION

The judgment appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

RAPHAEL
J.


18